UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



STEPHANIE OVERTON,

       *Plaintiff,*

       -against-

ART FINANCE PARTNERS LLC, AF FUNDING LLC,
KNICKERBOCKER FUNDING LLC, SKARSTEDT
FINE ART, LTD., SKARSTEDT GALLERY, LTD.,
STEBICH RIDDER INTERNATIONAL, INC., DAVID
TUNICK, INC., and SCOTT GERSON CONSERVATION
LLC,

       *Defendants.*

**ECF CASE**

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff, Stephanie Overton, by her attorneys Cahill Partners LLP, for her complaint against Art Finance Partners LLC ("AFP"), AF Funding LLC ("AFF"), Knickerbocker Funding LLC ("Knickerbocker") (collectively, AFP, AFF, and Knickerbocker are referred to as the "Financing Companies"), Skarstedt Fine Art, Ltd. ("SFA"), Skarstedt Gallery, Ltd. ("SG") (together, SFA and SG are referred to as the "Skarstedt Entities"), Stebich Ridder International, Inc. ("SRI"), David Tunick, Inc. ("Tunick") and Scott Gerson Conservation LLC ("SGC") (collectively, "Defendants") hereby alleges as follows:

### NATURE OF ACTION

1.      Plaintiff is the rightful owner of a collection of valuable works of fine art (the "Works") that have been unlawfully converted by Defendants with the assistance of Timothy Sammons, Inc. ("TSI") and Timothy Sammons ("Sammons") individually.

2.      The actions of TSI are of such a grave nature that they have already resulted in the issuance of a freezing injunction from the United Kingdom's High Court of Justice, freezing the

assets of TSI and Sammons, and requiring Sammons to turn his passport over to the Court (the "UK Order").

3.    Plaintiff has sought the return of the Works from Defendants but, so far, has been stonewalled in her efforts to determine the current locations of the Works and if any of the Defendants have attempted to transfer title to the Works to other third-parties.

4.    Defendants were not buyers in good faith and were not buyers in the ordinary course of business, and, as such, Defendants did not acquire any right, title or interest in any of the Works.

5.    Plaintiff seeks replevin of the Works, and damages for conversion and aiding and abetting a breach of fiduciary duty by certain Defendants.

## PARTIES, JURISDICTION AND VENUE

6.    Plaintiff is an individual and citizen of New Zealand.

7.    On information and belief, defendant Art Finance Partners LLC is a Delaware limited liability company with its principal place of business at 41 East 57th Street, New York, NY 10022, that is doing business in this judicial District. On information and belief, the members of Art Finance Partners LLC are citizens of New York.

8.    On information and belief, defendant AF Funding LLC is a Delaware limited liability company with its principal place of business at 41 East 57th Street, New York, NY 10022, that is doing business in this judicial District. On information and belief, the members of AF Funding LLC are citizens of New York.

9.    On information and belief, defendant Knickerbocker Funding LLC is a Delaware limited liability company with its principal place of business at 41 East 57th Street, New York,

NY 10022, that is doing business in this judicial District. On information and belief, the members of Knickerbocker Funding LLC are citizens of New York.

10.     On information and belief, defendant Skarstedt Gallery, Ltd. is a New York corporation with its principal place of business at 20 East 79th Street, New York, NY 10075, and is doing business in this judicial District.

11.     On information and belief, defendant Skarstedt Fine Art, Ltd. is a New York corporation with its principal place of business at 20 East 79th Street, New York, NY 10075, and is doing business in this judicial District.

12.     On information and belief, defendant Stebich Ridder International, Inc. is a New York corporation with its principal place of business at 599 Eleventh Avenue, New York, NY 10036, and is doing business in this judicial District.

13.     On information and belief, defendant David Tunick, Inc. is a New York corporation with its principal place of business at 13 East 69th Street, New York, NY 10021, and is doing business in this judicial District.

14.     On information and belief, defendant Scott Gerson Conservation LLC is a New York limited liability company with its principal place of business at 465 West 23rd Street, New York, NY 10011, and is doing business in this judicial District. On information and belief, the members of Scott Gerson Conservation LLC are citizens of New York.

15.     Jurisdiction is appropriate in this Court pursuant to 28 U.S.C. § 1332(a)(2), as there is diversity of citizenship, and the amount in controversy exceeds $75,000.

16.     Venue is appropriate in this district pursuant to 28 U.S.C. § 1391, as a substantial part of the events and omissions giving rise to the claim occurred in the Southern District of New York.

## STATEMENT OF FACTS

17.    Plaintiff is the rightful owner of the Works, which include works of fine art created by Marc Chagall (the "Chagall Work"), Raoul Dufy (the "Dufy Work"), Lucio Fontana (the "Fontana Work"), Rene Magritte (the "Magritte Work"), Amedeo Modigliani (the "Modigliani Work"), Henry Moore (the "Moore Work"), Pablo Picasso (the "Picasso Work"), and Tom Wesselmann (the "Wesselmann Work"). A list of the Works is provided for in Paragraph 43 of the UK Order, a copy of which is annexed hereto as **Exhibit A.**

18.    Over the course of several years, Plaintiff provided the Works to TSI, which was acting as her art advisor at the time.

19.    At no time was TSI was ever authorized to complete a sale for any or all of the Works.

20.    At no time did Plaintiff ever transfer an ownership interest in any of the Works to TSI.

21.    TSI has never had any ownership interest in the Works.

22.    No later than 2013, TSI began experiencing financial difficulties.

23.    On information and belief, no later than 2013, the Skarstedt Entities learned of the financial difficulties that TSI was experiencing.

24.    On information and belief, no later than 2014, the Financing Companies learned of the financial difficulties that TSI was experiencing.

25.    On information and belief, Andrew Rose ("Rose") is the President or controlling person of each of the Financing Companies.

26.    AFP has been involved in a number of art world-related scandals that have adversely affected its and Rose's business reputations.

4

27.    For example, AFP and Mr. Rose were sued by the now-defunct Berry-Hill Galleries for allegedly engaging in a "continuous and ongoing pattern of deceptions, misrepresentations and omissions."

28.    Indeed, a senior executive at Christie's Inc., a leading auction house, publicly remarked at the time of that lawsuit that the conduct of Rose caused Christie's "to have suffered significant damages."

29.    Christie's later sued AFP alleging fraud and breach of contract.

**The Magritte Work**

30.    On information and belief, TSI entered into an agreement with one of the Skarstedt Entities in June 2013 (the "Purchase Agreement"), in which TSI purported to transfer title to the Magritte Work to one of the Skarstedt Entities.

31.    On information and belief, there were significant "red flags" that the Skarstedt Entities ignored when seeking to purchase the Magritte Work.

32.    On information and belief, one of the Skarstedt Entities paid TSI an amount materially below the fair market value for the Magritte Work.

33.    On information and belief, the amount paid to TSI was less than half of the fair market value of the Magritte Work.

34.    On information and belief, the Skarstedt Entities did not conduct reasonable due diligence into the true ownership of the Magritte Work.

35.    On information and belief, the Skarstedt Entities did not conduct reasonable due diligence into the authority of TSI or any other person to sell the Magritte Work.

36.    On information and belief, the Skarstedt Entities knew that TSI had borrowed funds from one or more of the Finance Companies.

37.    On information and belief, the Skarstedt Entities knew that TSI was in difficult financial circumstances when entering into the Purchase Agreement.

38.    On information and belief, the amounts paid by the Skarstedt Entities were sufficiently low to have put the Skarstedt Entities on notice that aspects of the transaction were questionable.

39.    On information and belief, the Skarstedt Entities are no longer in possession of the Magritte Work.

40.    On information and belief, in a short time, one of the Skarstedt Entities sold the Magritte Work for a higher price than it paid for the Magritte Work.

41.    The Skarstedt Entities have refused to provide Plaintiff with information concerning their dealings with the Magritte Work or its current location.

**The Moore Work**

42.    On information and belief, TSI entered into a sale and repurchase agreement (the "First Sale and Repurchase Agreement") with AFP in February 2014.

43.    Despite their lack of authorization to sell or transfer the Works, on information and belief, TSI purported to have an ownership interest in the Moore Work to AFP.

44.    On information and belief, AFP was aware that TSI did not own all the artworks in its possession.

45.    On information and belief, AFP did not conduct reasonable due diligence into the true ownership of the Moore Work.

46.    On information and belief, AFP did not conduct reasonable due diligence into the authority of TSI or any other person to sell the Moore Work.

47.    On information and belief, the First Sale and Repurchase Agreement purported to transfer title to the Moore Work to AFP.

48.    On information and belief, this was a sham transaction as AFP knew that TSI did not have (1) an ownership interest in the Moore Work or (2) authority to sell the Moore Work.

49.    On information and belief, there were significant "red flags" that AFP ignored when seeking to purchase the Moore Work.

50.    On information and belief, the AFP paid TSI an amount materially below the fair market value for the Moore Work.

51.    On information and belief, the amounts paid by AFP were sufficiently low to have put AFP on notice that aspects of the transaction were questionable.

52.    On information and belief, sale and repurchase agreements are not commercially reasonable documentation of an art transaction of the Moore Work.

53.    On information and belief, AFP continues to possess the Moore Work either at its offices or at SRI.

**The Modigliani Work**

54.    On information and belief, TSI entered into a loan agreement with Knickerbocker in July 2014 (the "First Loan Agreement").

55.    On information and belief, prior to entering into the First Loan Agreement, TSI delivered the Modigliani Work to AFP, at its storage space in SRI, in June 2014.

56.    Despite their lack of authorization to sell or transfer the Works, on information and belief, TSI purported to have an ownership interest in the Modigliani Work to Knickerbocker.

57.    On information and belief, Knickerbocker was aware that TSI did not own all the artworks in its possession.

58.    On information and belief, Knickerbocker did not conduct reasonable due diligence into the true ownership of the Modigliani Work.

59.    On information and belief, Knickerbocker did not conduct reasonable due diligence into the authority of TSI or any other person to sell the Modigliani Work.

60.    On information and belief, Knickerbocker filed UCC-1 financing statements that asserted a security interest in the Modigliani Work.

61.    On information and belief, when the First Loan Agreement with Knickerbocker came due, Knickerbocker placed the Modigliani Work for sale at Tunick.

62.    On information and belief, no prior notice of the sale of the Modigliani Work to TSI was provided.

63.    On information and belief, the sale of the Modigliani Work has not occurred and no commercially reasonable terms have been set; rather, public records filed *just two day ago*, indicate that Tunick is merely the bailee of AFP for a painting owned by Plaintiff in which AFP has unlawfully claimed an interest.

64.    On information and belief, AFP and Knickerbocker did not conduct reasonable due diligence into the true ownership of the Modigliani Work.

65.    On information and belief, AFP and Knickerbocker did not conduct reasonable due diligence into the authority of TSI or any other person to sell the Modigliani Work.

66.    On information and belief, there were significant "red flags" that AFP and Knickerbocker ignored in connection with the Modigliani Work.

67.    AFP has provided the Modigliani Work to Tunick.

68.     On information and belief, AFP has falsely stated to Tunick that it has the authority Modigliani Work.

69.     AFP has refused to authorize Tunick to release the Modigliani Work to Plaintiff.

70.     Tunick has provided helpful information to Plaintiff concerning the Modigliani Work, but has advised Plaintiff that it cannot release the Modigliani Work at the direction of AFP.

**The Chagall Work**

71.     On information and belief, TSI entered into a loan agreement with Knickerbocker in December 2014 (the "Second Loan Agreement").

72.     Despite its lack of authorization to sell or transfer the Works, on information and belief, TSI purported to have an ownership interest in the Chagall Work to Knickerbocker.

73.     On information and belief, Knickerbocker was aware that TSI did not own all the artworks in its possession.

74.     On information and belief, Knickerbocker did not conduct reasonable due diligence into the true ownership of the Chagall Work.

75.     On information and belief, Knickerbocker did not conduct reasonable due diligence into the authority of TSI or any other person to sell the Chagall Work.

76.     On information and belief, Knickerbocker filed UCC-1 financing statements that asserted a security interest in the Chagall Work on December 3, 2014.

77.     On information and belief, Knickerbocker assigned its purported interest in the Chagall Work to AFF on December 10, 2014.

78.     On information and belief, AFF demanded that TSI sell the Chagall Work to repay a loan to TSI or another person or entity affiliated with Sammons.

79.     On information and belief, AFF forced TSI to sell the Chagall Work to AFP in February 2015.

80.     On information and belief, this was a sham transaction as both AFF and AFP knew that TSI did not have (1) an ownership interest in the Chagall Work or (2) authority to sell the Chagall Work.

81.     On information and belief, AFP did not conduct reasonable due diligence into the true ownership of the Chagall Work.

82.     On information and belief, AFP did not conduct reasonable due diligence into the authority of TSI or any other person to sell the Chagall Work.

83.     On information and belief, there were significant "red flags" that AFP ignored when seeking to purchase the Chagall Work.

84.     On information and belief, the AFP paid TSI an amount materially below the fair market value for the Chagall Work.

85.     On information and belief, AFP only transferred $70,000 to TSI's bank account for the Chagall Work.

86.     On information and belief, the amounts paid by AFP were sufficiently low to have put AFP on notice that aspects of the transaction were questionable.

87.     On information and belief, the Bill of Sale issued by TSI intentionally provided that the purchase price was to remain confidential because of its materially low price.

88.     AFP has provided the Chagall Work to Tunick.

89.     On information and belief, AFP has falsely stated to Tunick that it is the true owner of the Chagall Work.

90.     AFP has refused to authorize Tunick to release the Chagall Work to Plaintiff.

91.     Tunick has provided helpful information to Plaintiff concerning the Chagall Work, but has advised Plaintiff that it cannot release the Chagall Work at the direction of AFP.

**The Picasso Work**

92.     On information and belief, TSI entered into a loan agreement with Knickerbocker in December 2014 (the "Third Loan Agreement").

93.     Despite their lack of authorization to sell or transfer the Works, on information and belief, TSI purported to have an ownership interest in the Picasso Work to Knickerbocker.

94.     On information and belief, Knickerbocker was aware that TSI did not own all the artworks in its possession.

95.     On information and belief, Knickerbocker did not conduct reasonable due diligence into the true ownership of the Picasso Work.

96.     On information and belief, Knickerbocker did not conduct reasonable due diligence into the authority of TSI or any other person to sell the Picasso Work.

97.     On information and belief, Knickerbocker filed UCC-1 financing statements that asserted a security interest in the Picasso Work.

98.     On information and belief, Knickerbocker assigned its purported interest in the Picasso Work to AFF in December 2014.

99.     On information and belief, when the Third Loan Agreement came due, AFF demanded that TSI sell the Picasso Works to repay the loan it purportedly made to TSI or another person or entity affiliated with Sammons.

100.    On information and belief, TSI entered into an agreement with one of the Skarstedt Entities in February 2015, in which TSI purported to transfer title to the Picasso Work to one of the Skarstedt Entities.

101.    On information and belief, there were significant "red flags" that the Skarstedt Entities ignored when seeking to purchase the Picasso Work.

102.    On information and belief, the Skarstedt Entities paid TSI an amount materially below the fair market value for the Picasso Work.

103.    On information and belief, the amounts paid by the Skarstedt Entities were sufficiently low to have put the Skarstedt Entities on notice that aspects of the transaction were questionable.

104.    On information and belief, the Skarstedt Entities paid $1,550,000 directly to AFP despite the fact that AFF publicly purported to hold a security interest in the Picasso.

105.    On information and belief, the Skarstedt Entities did not conduct reasonable due diligence into the true ownership of the Picasso Work.

106.    On information and belief, the Skarstedt Entities did not conduct reasonable due diligence into the authority of TSI or any other person to sell the Picasso Work.

107.    On information and belief, the Skarstedt Entities knew that TSI had borrowed funds from one or more of the Finance Companies.

108.    On information and belief, the Skarstedt Entities knew that TSI was in difficult financial circumstances when entering into the transaction.

109.    On information and belief, AFP's (or any of the other Financing Companies') involvement in the transaction was a red flag of TSI's difficult financial position that required the Skarstedt Entities to conduct further due diligence.

110.    On information and belief, the Skarstedt Entities did not seek to remove a lien placed on the Picasso Work.

111.    On information and belief, the Skarstedt Entities are no longer in possession of the Picasso Work.

112.    On information and belief, in a short time, one of the Skarstedt Entities sold the Picasso Work for a higher price than it paid for the Picasso Work.

113.    The Skarstedt Entities have failed to provide Plaintiff with information concerning their dealings with the Picasso Work or its current location.

**The Fontana Work**

114.    On information and belief, TSI entered into a loan agreement with Knickerbocker in January 2015 (the "Fourth Loan Agreement").

115.    Despite their lack of authorization to sell or transfer the Works, on information and belief, TSI purported to have an ownership interest in the Fontana Work to Knickerbocker.

116.    On information and belief, Knickerbocker was aware that TSI did not own all the artworks in its possession.

117.    On information and belief, Knickerbocker did not conduct reasonable due diligence into the true ownership of the Fontana Work.

118.    On information and belief, Knickerbocker did not conduct reasonable due diligence into the authority of TSI or any other person to sell the Fontana Work.

119.    On information and belief, Knickerbocker filed UCC-1 financing statements that asserted a security interest in the Fontana Work.

120.    On information and belief, when the Fourth Loan Agreement with Knickerbocker came due, Knickerbocker demanded that TSI sell the Fontana Works to repay the loan.

121.    On information and belief, TSI entered into an agreement with one of the Skarstedt Entities in which TSI purported to transfer title to the Fontana Work to one of the Skarstedt Entities.

122.    On information and belief, there were significant "red flags" that the Skarstedt Entities ignored when seeking to purchase the Fontana Work.

123.    On information and belief, the Skarstedt Entities paid TSI an amount materially below the fair market value for the Fontana Work.

124.    On information and belief, the Skarstedt Entities paid $600,000 directly to AFP despite the fact that Knickerbocker publicly purported to hold a security interest in the Picasso.

125.    On information and belief, the Skarstedt Entities knew that TSI had borrowed funds from one or more of the Finance Companies.

126.    On information and belief, the Skarstedt Entities knew that TSI was in difficult financial circumstances when entering into the transaction.

127.    On information and belief, the amounts paid by the Skarstedt Entities were sufficiently low to have put the Skarstedt Entities on notice that aspects of the transaction were questionable.

128.    On information and belief, the Skarstedt Entities did not conduct reasonable due diligence into the true ownership of the Fontana Work.

129.    On information and belief, the Skarstedt Entities did not conduct reasonable due diligence into the authority of TSI or any other person to sell the Fontana Work.

130.    On information and belief, AFP's (or any of the other Financing Companies') involvement in the transaction was a red flag of TSI's precarious financial position that required the Skarstedt Entities to conduct further due diligence.

131.    On information and belief, the Skarstedt Entities are no longer in possession of the Fontana Work.

132.    On information and belief, one of the Skarstedt Entities sold the Fontana Work at a higher price than it paid for the Fontana Work.

133.    The Skarstedt Entities have refused to provide Plaintiff with information concerning their dealings with the Fontana Work or its current location.

**The Dufy and Wesselmann Works**

134.    On information and belief, TSI entered into a sale and repurchase agreement (the "Second Sale and Repurchase Agreement") with AFP in February 2014.

135.    Despite their lack of authorization to sell or transfer the Works, on information and belief, TSI purported to have an ownership interest in the Dufy Work and the Wesselmann Work to AFP.

136.    On information and belief, AFP was aware that TSI did not own all the artworks in its possession.

137.    On information and belief, AFP did not conduct reasonable due diligence into the true ownership of the Dufy Work and the Wesselmann Work.

138.    On information and belief, AFP did not conduct reasonable due diligence into the authority of TSI or any other person to sell the Dufy Work and the Wesselmann Work.

139.    On information and belief, the Second Sale and Repurchase Agreement purported to transfer title to the Dufy Work and the Wesselmann Work (among others) to AFP.

140.    On information and belief, this was a sham transaction as AFP knew that TSI did not have (1) an ownership interest in the Dufy Work and the Wesselmann Work or (2) authority to sell the Dufy Work and the Wesselmann Work.

141.    On information and belief, there were significant "red flags" that AFP ignored when seeking to purchase the Dufy Work and the Wesselmann Work.

142.    On information and belief, the AFP paid TSI an amount materially below the fair market value for the Dufy Work and the Wesselmann Work.

143.    On information and belief, the amounts paid by AFP were sufficiently low to have put AFP on notice that aspects of the transaction were questionable.

144.    On information and belief, AFP continues to possess the Dufy Work either at its offices or at SRI.

145.    On information and belief, the Wesselmann Work is in the possession SGC for conservation.

146.    On information and belief, AFP has falsely stated to SGC that it is the true owner of the Wesselmann Work.

**Plaintiff's Efforts to Recover the Works**

147.    In April 2015, after receiving a back-dated list from TSI of insurance prices for some of her works (which were not consigned but were provided to TSI for photography purposes), Plaintiff sought the return of all of the Works.

148.    In response, TSI stalled, informing Plaintiff, as recently as last week, that it was in possession of all the Works in New York and would return them shortly.

149.    Thereafter, Plaintiff learned that a receiver had been appointed in London to oversee the remaining assets of Sammons's UK company.

150.    Plaintiff sought more information concerning the location of her Works and learned that the Financing Companies has placed security interests on some of the Works and had appeared to take possession of other Works.

151.    In providing false information to Plaintiff, the Financing Companies were assisting TSI to hide the Works and information about the purported sales and consignments of certain Works knowing that Plaintiff had been misled by TSI to believe that TSI still controlled the Works.

152.    Plaintiff, via counsel, sought information concerning the circumstances by which the Financing Companies had placed security interests on some of the Works and taken possession of other Works.

153.    The Financing Companies, through Rose, claimed that (a) all of the loans to TSI from the Financing Companies has been repaid, (b) that all of the Works that the Financing Companies had asserted security interests in had been released by SRI to TSI.

154.    Plaintiff, through counsel, subsequently learned that both the Modigliani Work and the Chagall Work had been delivered to Tunick by the Financing Companies and were being offered for sale.

155.    The Financing Companies, through counsel, have refused to provide the terms under which they took possession of some of the Works or what authority they have to seek to sell the Works.

156.    None of the Defendants have ever been authorized to transfer title to any of the Works.

157.    Title to any of the Works has not been transferred to the Defendants or any third-parties.

158.    Plaintiff remains the rightful owner of the Works.

**FIRST CLAIM FOR RELIEF**
**(Replevin – Against All Defendants)**

159.    Plaintiff repeats and realleges the allegations in Paragraphs 1 through 158 of her Complaint.

160.    Plaintiff is the rightful owner of the Works.

161.    The Works are valuable and unique property and should be immediately returned to Plaintiff.

162.    The Defendants are in possession of certain of the Works.

163.    The right of Plaintiff to possess the Works is superior to any right claimed by Defendants.

164.    Despite due demand, and without legal justification, Defendants have refused to (1) return the Works to Plaintiff or (2) provide Plaintiff with information concerning the current location of the Works.

165.    The Defendants have unlawfully retained possession of the Works.

166.    As a result of the foregoing, Plaintiff is entitled to the return of the Works.

**SECOND CLAIM FOR RELIEF**
**(Conversion – Against All Defendants)**

167.    Plaintiff repeats and realleges the allegations in Paragraphs 1 through 166 of her Complaint.

168.    Plaintiff is the rightful owner of the Works.

169.    The right of Plaintiff to possess the Works is superior to any right claimed by Defendants.

170.    On information and belief, Defendants nonetheless (i) assumed and exercised rights of ownership over the Works, and (ii) attempted to commercially exploit their claimed ownership interest in the Works.

171.    Plaintiff has demanded the return of the Works from Defendants and all information concerning the present locations of the Works.

172.    Defendants have refused to (1) provide Plaintiff with the locations of several of the Works and (2) refused to return the Works that are in Defendants' possession.

173.    As a result of Defendants' unlawful conduct, Plaintiff is unable to ascertain the locations of some of the Works and may not be able to recover them.

174.    Plaintiff has been damaged as a result of Defendants' unlawful conversion in an amount to be proven at trial, that is well in excess of $1,000,000.

**THIRD CLAIM FOR RELIEF**
**(Aiding and Abetting a Breach of Fiduciary Duty – Against the Financing Companies)**

175.    Plaintiff repeats and realleges the allegations in Paragraphs 1 through 174 of her Complaint.

176.    TSI owed a fiduciary duty to Plaintiff by virtue of being the bailee of Works.

177.    TSI breached its fiduciary duty to Plaintiff by pledging some of the Works as collateral to the Financing Companies.

178.    TSI breached its fiduciary duty to Plaintiff by allowing the other Defendants to take possession of the Works.

179.    TSI breached its fiduciary duty to Plaintiff by purporting to transfer title to some of the Works to the other Defendants.

180.    On information and belief, the Financing Companies were aware of TSI's precarious financial position.

19

181.    On information and belief, the Financing Companies were aware that TSI was not the true owner of the Works.

182.    On information and belief, the Financing Companies were aware that TSI was not authorized to transfer ownership or possession of the Works.

183.    The Financing Companies nonetheless knowingly induced TSI to enter into a series of agreements purporting to transfer title to the Works so that the Financing Companies could recoup their loans to TSI.

184.    The Financing Companies directly participated in TSI's breach of its fiduciary duty to Plaintiff by arranging to be paid directly by the Skarstedt Entities from the purported sale of some of Plaintiff's Works.

185.    The Financing Companies directly participated in TSI's breach of its fiduciary duty to Plaintiff by consigning some of the Works to Tunick despite their knowledge that title to the Works still remained with Plaintiff.

186.    The Financing Companies directly participated in TSI's breach of its fiduciary duty to Plaintiff by falsely stating to Plaintiff, through her agent, that all Works that the Financing Companies had asserted security interests in had been released by SRI to TSI and were no longer in their possession or control.

187.    The actions of the Financing Companies were knowingly deceitful and maliciously intended to cause Plaintiff harm and to enrich themselves at Plaintiff's expense.

188.    Plaintiff has been damaged as a result of the Financing Companies' aiding and abetting a breach of fiduciary duty in an amount to be proven at trial, that is well in excess of $1,000,000.

**WHEREFORE**, Plaintiff respectfully requests the entry of a judgment:

a.       Ordering Defendants to immediately return any of the Works in their possession or control to Plaintiff;

b.       Ordering the Financing Companies, the Skarstedt Entities, and SRI to pay Plaintiff damages, including punitive damages, from the conversion of any of her Works that cannot be returned to her;

c.       Awarding Plaintiff the costs and expenses of this action, including her reasonable attorneys' fees; and

d.       Awarding the Plaintiff such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a jury trial with respect to all issues triable before a jury.

Dated: New York, New York
       May 21, 2015

                                        **CAHILL PARTNERS** LLP


                                        John R. Cahill
                                        Ronald W. Adelman
                                        Paul S. Cossu
                                        70 West 40th Street
                                        New York, New York 10018
                                        (212) 719-4400

                                        *Attorneys for Plaintiff*
                                        *Stephanie Overton*

21

# EXHIBIT A

PENAL NOTICE

**IF YOU THE WITHIN-NAMED TIMOTHY SAMMONS DO NOT COMPLY WITH THIS ORDER YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND IMPRISONED OR FINED OR HAVE YOUR ASSETS SEIZED.**

**IF YOU THE WITHIN-NAMED TIMOTHY SAMMONS, INC DO NOT COMPLY WITH THIS ORDER, YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND FINED OR YOUR ASSETS MAY BE SEIZED**

**IF TIMOTHY SAMMONS, INC DOES NOT COMPLY WITH THIS ORDER, YOU, TIMOTHY SAMMONS (CHIEF EXECUTIVE OFFICER OF THE SAID TIMOTHY SAMMONS, INC) MAY BE HELD TO BE IN CONTEMPT OF COURT AND IMPRISONED OR FINED OR HAVE YOUR ASSETS SEIZED.**

**ANY PERSON WHO KNOWS OF THIS ORDER AND DOES ANYTHING WHICH HELPS OR PERMITS THE RESPONDENTS OR EITHER OF THEM TO BREACH THE TERMS OF THIS ORDER MAY BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED.**



**FREEZING INJUNCTION**

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

**Claim No.: HC-2015-001912**

Before the Honourable Mr Justice Newey

18 May 2015

BETWEEN:

**MS STEPHANIE OVERTON**

**Applicant**

- and -

**(1) TIMOTHY SAMMONS, INC**
**(2) MR TIMOTHY SAMMONS**

**Respondents**

TO:

(1) TIMOTHY SAMMONS, INC of 19 East 66th Street, New York, New York, 10065
(2) TIMOTHY SAMMONS, of 16 Gloucester Hill, London, NW1 7DS

**UPON HEARING Counsel for the Applicant, James Aldridge QC**

**THIS ORDER**

1.  This is a Freezing Injunction made against Timothy Sammons, Inc and Timothy Sammons ("the Respondents") on 18 May 2015 by Mr Justice Newey on the application of Stephanie Overton ("the Applicant"). This Order also grants other injunctive relief, as set out herein. The Judge read the Affidavits listed in Schedule A and accepted the undertakings set out in Schedule B at the end of this order.

2.  This order was made at a hearing without notice to the Respondents. The Respondents have a right to apply to the Court to vary or discharge this order – see paragraph 35 below.

3.  There will be a further hearing in respect of this order on 3 June 2015 ("the return date").

4.  If there is more than one Respondent –

    (a)  unless otherwise stated, references in this order to "the Respondents" or "the Respondent" mean both or all of them; and

    (b)  this order is effective against any Respondent on whom it is served or who is given notice of it.

**PROPRIETARY INJUNCTION**

5.    Until after the return date or further order of the court, the Respondents must not in any way dispose of, deal with, diminish, mix, move or part with possession of any of the Assets (as defined in paragraph 43 below) which are in (or come into) his and/or its power possession custody or control.

## PROVISION OF INFORMATION ABOUT THE ASSETS FROZEN BY THE PROPRIETARY INJUNCTION

5A    Each of the Respondents must immediately upon service of this order inform the Applicant's legal representatives, in so far as he or it is aware of such, of:

    (a)    the present location of each of the Works (as defined in paragraph 43 below);

    (b)    in respect of each of the Works, the person who has possession of it;

    (c)    in respect of each the Works, the circumstances in which it came into the possession of the person who has possession of it and the basis upon which that person has possession of it (but only if that person is someone other than the Respondents).

6.    Each of the Respondents must within 24 hours of service of this order and to the best of his/ its ability, inform the Applicant's legal representatives in writing (which obligation may be satisfied by emailing such writing to the Applicant's solicitors) of details of the Assets, including the location, nature and value of the Assets, regardless of whether or not they are in the Respondents' own name, power, possession, custody or control, and whether they are solely or jointly owned. Without prejudice to the generality of the foregoing, each Respondent is to inform the Applicant's legal representatives of:

    (a)    the present precise location of each such Asset;

    (b)    the name and address of all persons, including financial institutions, holding any such assets;

    (c)    the names and numbers of all accounts holding any such Assets together with the name and address of the place where the account is held and the sums in the account; and

    (d)    details of all trusts which have received any of such Assets including the name and address of every trustee.

7.    Within 6 working days hours after being served with this order, each of the Respondents must swear and serve on the Applicant's legal representatives an affidavit setting out: (a) the information required to be disclosed under paragraph 6 above, and (b) together with the identity of all bank accounts held by or under the control of the Respondents since 1 April 2008, including the name and address of the place where the account was/is held.

8.    If the provision of any of the information to be provided in accordance with paragraphs 5A, 6 or 7 is likely to incriminate the Respondent providing the

3

information, he or it may be entitled to refuse to provide it, but is recommended to take legal advice before refusing to provide the information. Wrongful refusal to provide the information is contempt of court and may render the Respondents liable to be imprisoned, fined or have his/its assets seized.

## FREEZING INJUNCTION (TIMOTHY SAMMONS' ASSETS)

9. Until after the return date or further order of the Court, Timothy Sammons must not without the prior consent of the Applicant's solicitors:

    (a) remove from England and Wales any of his assets which are in England and Wales up to the value of £7,000,000; or

    (b) in any way dispose of, deal with or diminish the value of any of his assets whether they are in or outside England and Wales up to the same value.

10. Paragraph 9 applies to all of Timothy Sammons' assets whether or not they are in his own name and whether they are solely or jointly owned. For the purpose of this order Timothy Sammons' assets include any asset which he has the power, directly or indirectly, to dispose of or deal with as if it were his own. Timothy Sammons is to be regarded as having such power if a third party holds or controls the asset in accordance with his direct or indirect instructions.

11. This prohibition includes the following assets in particular –
    (a) the property known as 16 Gloucester Hill, London, NW1 7DS or the net sale money after payment of any mortgages if it has been sold;
    (b) the property and assets of any business conducted by Timothy Sammons or the sale money if any of them have been sold; and
    (c) any money standing to the credit of any bank account including the amount of any cheque drawn on such account which has not been cleared.

12. (a) If the total value free of charges or other securities ('unencumbered value') of Timothy Sammons' assets in England and Wales exceeds £7,000,000, Timothy Sammons may remove any of those assets from England and Wales or may dispose of or deal with them so long as the total unencumbered value of Timothy Sammons' assets still in England and Wales remains above £7,000,000.

    (b) If the total unencumbered value of Timothy Sammons' assets in England and Wales does not exceed £7,000,000, Timothy Sammons must not remove any of those assets from England and Wales and must not dispose of or deal with any of them. If Timothy Sammons has other assets outside England and Wales, he may dispose of or deal with those assets outside England and Wales so long as the total unencumbered value of all his assets whether in or outside England and Wales remains above £7,000,000.

    (c) Sub-paragraphs (a) and (b) above do not apply to the Assets.

## PROVISION OF INFORMATION (TIMOTHY SAMMONS' ASSETS)

13.   Unless paragraph 15 applies, Timothy Sammons must within 24 hours of service upon him of this order—and to the best of his ability and inform the Applicant's solicitors in writing (which obligation may be satisfied by emailing such writing to the Applicant's solicitors) of all of his assets world-wide exceeding £2,000 in value whether in his own name or not and whether solely or jointly owned giving the value location and details of all such assets. The information must include:

    (a)   the name and address of all persons including financial institutions holding any such assets;

    (b)   details of Timothy Sammons' current salary or other form of income, identifying the amounts paid, by whom they are paid and the account or accounts into which sums are paid;

    (c)   the identity of all accounts held by or under the control of Timothy Sammons, together with the name and address of the place where the account is held and the sums in the account;

    (d)   details (including addresses) of any real property in which Timothy Sammons has any interest, wherever in the world those may be situated, including an interest in any of the net sale money if the property were to be sold (these details must include details of any mortgage or charge on the property);

    (e)   details of all securities or investments or interests in any corporation;

    (f)   details of all trusts of which Timothy Sammons is a beneficiary or within the class of possible beneficiaries, including the name and address of every trustee;

    (g)   particulars of any income or debt due to Timothy Sammons including the name and address of the debtor;

    (h)   particulars of the inquiries made by him in order to provide that information.

14.   Unless paragraph 15 applies, within 6 working days after being served with this order Timothy Sammons must swear and serve on the Applicant's legal representatives an affidavit setting out (a) the information required to be disclosed under paragraph 13 above, and (b) together with the identity of all bank accounts held by or under the control of Timothy Sammons since 1 April 2008, including the name and address of the place where the account was/is held.

15.   If the provision of any of the information to be provided in accordance with paragraphs 13 and 14 is likely to incriminate Timothy Sammons, he may be entitled to refuse to provide it, but is recommended to take legal advice before refusing to provide the information. Wrongful refusal to provide the information is contempt of court and may render Timothy Sammons liable to be imprisoned, fined or have his assets seized.

**FREEZING INJUNCTION (TIMOTHY SAMMONS, INC'S ASSETS)**

16. Until after the return date or further order of the Court, Timothy Sammons, Inc must not without the prior consent of the Applicant's solicitors:

    (a) remove from England and Wales any of its assets which are in England and Wales up to the value of £7,000,000; or

    (b) in any way dispose of, deal with or diminish the value of any of its assets whether they are in or outside England and Wales up to the same value.

17. Paragraph 16 applies to all Timothy Sammons, Inc's assets whether or not they are in its own name and whether they are solely or jointly owned. For the purpose of this order Timothy Sammons, Inc's assets include any asset which it has the power, directly or indirectly, to dispose of or deal with as if it were its own. Timothy Sammons, Inc is to be regarded as having such power if a third party holds or controls the asset in accordance with its direct or indirect instructions.

18. This prohibition includes the following assets in particular –
    (a) the property and assets of Timothy Sammons, Inc's business or the sale money if any of them have been sold; and
    (b) any money standing to the credit of any bank account including the amount of any cheque drawn on such account which has not been cleared.

19. (a) If the total value free of charges or other securities ('unencumbered value') of Timothy Sammons, Inc's assets in England and Wales exceeds £7,000,000, Timothy Sammons, Inc may remove any of those assets from England and Wales or may dispose of or deal with them so long as the total unencumbered value of Timothy Sammons, Inc's assets still in England and Wales remains above £7,000,000.

    (b) If the total unencumbered value of Timothy Sammons, Inc's assets in England and Wales does not exceed £7,000,000, Timothy Sammons, Inc must not remove any of those assets from England and Wales and must not dispose of or deal with any of them. If Timothy Sammons, Inc has other assets outside England and Wales, it may dispose of or deal with those assets outside England and Wales so long as the total unencumbered value of all its assets whether in or outside England and Wales remains above £7,000,000.

    (c) Sub-paragraphs (a) and (b) above do not apply to the Assets.

**PROVISION OF INFORMATION (TIMOTHY SAMMONS, INC'S ASSETS)**

20. Unless paragraph 22 applies, Timothy Sammons, Inc must within 24 hours of service upon it of this order and to the best of its ability and inform the Applicant's solicitors in writing (which obligation may be satisfied by emailing such writing to the Applicant's solicitors) of all of its assets world-wide exceeding £2,000 in value whether in its own name or not and whether solely or jointly owned giving the value location and details of all such assets. The information must include:

(a)   the name and address of all persons including financial institutions holding any such assets;

(b)   the identity of all accounts held by or under the control of it, together with the name and address of the place where the accounts are held and the sums in those accounts;

(c)   details (including addresses) of any real property in which it has any interest, wherever in the world those may be situated, including an interest in any of the net sale money if the property were to be sold (these details must include details of any mortgage or charge on the property);

(d)   details of all securities or investments or interests in any corporation ;

(e)   details of all trusts of which it is a beneficiary or within the class of potential beneficiaries, including the name and address of every trustee;

(f)   particulars of any income or debt due to it including the name and address of the debtor;

(g)   particulars of the inquiries made by it in order to provide that information.

21.   Unless paragraph 22 applies, within 6 working days after being served with this order, Timothy Sammons, Inc must swear and serve on the Applicant's solicitors an affidavit setting out (a) the information required to be disclosed by it under paragraph 20 above, and (b) together with the identity of all bank accounts held by or under the control of it since 1 April 2008, including the name and address of the place where the account was/ is held.

22.   If the provision of any of the information to be provided in accordance with paragraphs 20 and 21 is likely to incriminate Timothy Sammons, Inc, it may be entitled to refuse to provide it, but is recommended to take legal advice before refusing to provide the information. Wrongful refusal to provide the information is contempt of court and may render it and/or its officers liable to be imprisoned, fined or have its or his assets seized.

23.   Unless paragraph 25 applies, Timothy Sammons must within 24 hours of service upon him of this order and to the best of his ability and inform the Applicant's solicitors in writing (which obligation may be satisfied by emailing such writing to the Applicant's solicitors) of all assets of Timothy Sammons, Inc world-wide exceeding £2,000 in value whether in its own name or not and whether solely or jointly owned, giving the value location and details of all such assets. The information must include:

(a)   the name and address of all persons including financial institutions holding any such assets;

(b)   the identity of all accounts held by or under the control of Timothy Sammons, Inc, together with the name and address of the place where the accounts are

held and the sums in those accounts;

(c)  details (including addresses) of any real property in which Timothy Sammons, Inc has any interest, wherever in the world those may be situated, including an interest in any of the net sale money if the property were to be sold (these details must include details of any mortgage or charge on the property);

(d)  details of all securities or investments or interests in any corporation;

(e)  details of all trusts of which Timothy Sammons, Inc is a beneficiary or within the class of potential beneficiaries, including the name and address of every trustee;

(f)  particulars of any income or debt due to Timothy Sammons, Inc including the name and address of the debtor;

(g)  particulars of the inquiries made by him in order to provide that information.

24.  Unless paragraph 25 applies, within 6 working days after being served with this order, Timothy Sammons must swear and serve on the Applicant's solicitors an affidavit setting out (a) the information required to be disclosed by him under paragraph 23 above, and (b) together with the identity of all bank accounts held by or under the control of any of Timothy Sammons, Inc since 1 April 2008, including the name and address of the place where the account was/ is held.

25.  If the provision of any of the information to be provided in accordance with paragraphs 23 and 24 is likely to incriminate Timothy Sammons, he may be entitled to refuse to provide it, but is recommended to take legal advice before refusing to provide the information.  Wrongful refusal to provide the information is contempt of court and may render Timothy Sammons liable to be imprisoned, fined or have his assets seized.

## RESTRICTION FROM LEAVING THE JURISDICTION; DELIVERY UP OF PASSPORT

26.  Timothy Sammons be restrained from leaving England and Wales until 4 pm on 21 May 2015, or until further Order.

27.  Timothy Sammons do forthwith deliver up his passports to the person who shall serve this Order upon him.

## EXCEPTIONS TO THIS ORDER

28.  (a)  This order does not prevent Timothy Sammons from spending £500 a week towards his ordinary living expenses and also does not prevent any Respondent from spending reasonable sums on legal advice and representation. But before spending any money the Respondent must tell the Applicants' legal representatives where the money is to come from, and any amount must be taken from the Respondents' own assets and not from the Assets.

(b)   This order does not prohibit any Respondent from dealing with or disposing of any of his or its assets in the ordinary and proper course of business but this exception does not apply to the Assets.

(c)   The Respondent may agree with the Applicant's legal representatives that the above spending limits should be increased or that this order should be varied in any other respect, but any agreement must be in writing.

(d)   Paragraphs 9 to 12 of this order will cease to have effect as against Timothy Sammons if he –

    (i)   provides security by paying £7,000,000 to be held to the order of the court; or

    (ii)  makes provision for security in that sum by another method agreed with the Applicant's legal representatives.

(e)   Paragraphs 16 to 19 of this order will cease to have effect as against Timothy Sammons, Inc if it –

    (i)   provides security by paying £7,000,000 to be held to the order of the court; or

    (ii)  makes provision for security in that sum by another method agreed with the Applicant's legal representatives.

## PRESERVATION AND DELIVERY UP OF DOCUMENTS

29.   The Respondents and each of them must preserve and must not dispose of or part with possession of:

(a)   the Specified Documents (as defined in paragraph 43 below);

(b)   any documents that relate to or evidence the existence, location or value or details of any of Timothy Sammons' assets or of Timothy Sammons, Inc's assets.

30.   [Intentionally blank]

## RESTRICTION

31.   Pursuant to section 46(1) of the Land Registration Act 2002, the Chief Land Registrar do forthwith enter a restriction on the register of title, in respect of Title Number 338796 in the following terms:
"Under an order of the High Court of Justice, Chancery Division, made on 18 May 2015 in Claim Number HC-2015-001912, no disposition by the proprietor of the registered estate is to be registered except under a further order of the Court or

with the consent of Ms Stephanie Overton'.

## SERVICE OUT OF JURISDICTION AND SERVICE BY ALTERNATIVE METHOD

32.   (1)   The Applicant does have permission to serve the following documents upon Timothy Sammons, Inc out of this jurisdiction and in New York, USA:

   (a)   the Claim Form;

   (b)   the Application Notice in respect of this Application, and all other documents provided to the Court in relation to this Application, and this Order, and the Application Notice and the Applicant's evidence in respect of the return date, and a note of this hearing;

   (c)   subject to any further order to contrary effect, all other documents in these proceedings, including (for the avoidance of any doubt) any Application Notices and any Orders.

   (2)   The period for Timothy Sammons, Inc to file an acknowledgment of service, or to file and serve an admission, is 22 days after service of the particulars of claim upon it;

   (3)   The period for Timothy Sammons, Inc to file a defence is:

   (a)   22 days after service of the particulars of claim upon it; or

   (b)   where Timothy Sammons, Inc has filed an acknowledgment of service, 36 days after service of the particulars of claim upon it.

## COSTS

33.   [Intentionally Blank]

34.   The costs of this application are reserved to the judge hearing the application on the return date.

## VARIATION OR DISCHARGE OF THIS ORDER

35.   Anyone served with or notified of this order may apply to the court at any time to vary or discharge this order (or so much of it as affects that person), but they must first inform the Applicant's solicitors. If any evidence is to be relied upon in support of this application, the substance of it must be communicated in writing to the Applicant's solicitors in advance.

## INTERPRETATION OF THIS ORDER

10

36. A Respondent who is an individual who is ordered not to do something must not do it himself or in any other way.  He must not do it through others acting on his behalf or on his instructions or with his encouragement.

37. A Respondent which is not an individual which is ordered not to do something must not do it by itself or by its directors, officers, partners, employees or agents or in any other way.

## PARTIES OTHER THAN THE APPLICANT AND RESPONDENT

38. **Effect of this order**

It is a contempt of court for any person notified of this order knowingly to assist in or permit a breach of this order. Any person doing so may be imprisoned, fined, or have his assets seized.

39. **Set off by banks**

This order does not prevent any bank from exercising any right of set off it may have in respect of any facility which it gave to the Respondent before it was notified of this order.

40. **Withdrawals by the Respondent**

No bank need enquire as to the application or proposed application of any money withdrawn by the Respondent if the withdrawal appears to be permitted by this order.

41. **Persons outside England and Wales**

(1) Except as provided in paragraph (2) below, the terms of this order do not affect or concern anyone outside the jurisdiction of this court.

(2) The terms of this order will affect the following persons in a country or state outside the jurisdiction of this court -

(a) The Respondent or his officer or agent appointed by power of attorney;

(b) any person who-

(i) is subject to the jurisdiction of this court;

(ii) has been given written notice of this order at his residence or place of business within the jurisdiction of this court; and

(iii) is able to prevent acts or omissions outside the jurisdiction of this court which constitute or assist in a breach of the terms of this order; and

(c) any other person, only to the extent that this order is declared enforceable by or is enforced by a court in that country or state.

42. **Assets located outside England and Wales**

11

Nothing in this order shall, in respect of assets located outside England and Wales, prevent any third party from complying with -

(1) what it reasonably believes to be its obligations, contractual or otherwise, under the law and obligations of the country or state in which those assets are situated or under the proper law of any contract between itself and the Respondent; and

(2) any orders of the courts of that country or state, provided that reasonable notice of any application for such an order is given to the Applicant's solicitors.

## DEFINED TERMS

43. In this order:

(1) "the Assets" means any of the following assets or any asset which represents (including without limitation by virtue of being proceeds of any sale or other dealing with or disposition of the same) the same, and includes:

　　a. The gouache on paper work 'Reverie' by Marc Chagall, measuring approximately 79 x 57 cm

　　b. The watercolour, pencil and gouache on paper work 'Syracuse' or 'Chateau sur La Cote' by Raoul Dufy, measuring approximately 48 x 64 cm

　　c. The acrylic on canvas work 'Concetto Spaziale, Aattese' by Lucio Fontana, measuring approximately 82 x 65 cm

　　d. The gouache on paper work 'La Geante' by Rene Magritte, measuring approximately 43 x 34 cm

　　e. The pencil and gouache on paper work 'Cariatide Rouge Sue Fond Noir' or 'Caryaide' by Amedeo Modigliani, measuring approximately 62 x 42 cm

　　f. The bronze work 'Small reclining figure' of 'Reclining figure' by Henry Moore, measuring approximately 9 cm x 15 cm x 7 cm

　　g. The oil on canvas work, 'Buste de Femme' or 'Tete de Femme' or 'Buste en Femme', by Pablo Picasso, measuring approximately 33 x 24 cm

　　h. The Liquitex on paper on board work 'Collage Study for the Mouth, no 10' by Tom Wesselmann, measuring approximately 40 x 38 cm

(1A) "the Works" means the works specified in paragraphs 43(1)(a) to (h) above

(2) "Specified Documents" means any and all documents that relate to or evidence the existence, location, value or details of any of the Assets

(3) "Documents" includes (but is not limited to) any information stored on a computer or computer hard disk or floppy disk or any other electronic medium or electronic storage device.

(4)    The term "assets" (whether used in the defined term "Assets" or generally in the word "asset") includes (but is not limited to):

    (a)  any proprietary interest in any company, corporate body, partnership or other trading entity whether held by way of shares, loan notes, bearer shares or otherwise;

    (b)  any right whether contractual or under a trust or otherwise to receive or to be paid money or property, whether unconditional or contingent or present or future;

    (c)  any interest in any trust including any interest in any discretionary trust or any right or expectation to be considered for a payment or advance under any discretionary private trust;

    (d)  any right or power to deal with any property, whether through nominees, power of attorney, or by instructing another person who habitually obeys instructions;

    (e)  any property held by or in the name of a third party or company who habitually obeys the Respondents' instructions in relation to dealings with such property;

    (f)  any property held in discretionary trust which the trustees habitually deal with according to the instructions of the Respondents;

    (g)  any money held in any bank account (whether in the name of the person or not) and in respect of which the person is an authorised signatory or in respect of which the person is a signatory on the mandate or in respect of which the signatory habitually obeys the instruction of that person or over which that person exercises de facto control including any such bank accounts in respect of which that person claims not to be the beneficial owner;

    (h)  any interest present future or contingent in any pension fund or life insurance scheme;

    (i)  any assets held by or in the name of or under the control of the Respondents.

(5)    "Details" of assets or the Assets include (but are not limited to):

    (a)  in respect of bank accounts or similar accounts, the name or names in which the account is held; the name of the bank, building society or similar institution, the address of the relevant branch, the number of the account, the balance and the names and addresses of all signatories and/or controllers of the account;

    (b)  in respect of real property, the address, the purchase price, the present approximate value and details of any encumbrances, charges or similar;

    (c)  in respect of shares, the number of shares held, their face value, their purchase price, and their approximate actual value;

    (d)  in respect of any interest held in any partnership or joint venture, the identity of the other partners or the venturers, and the nature and value of the business and property held by the partnership or joint venture and the proportion and value of the Respondents' interest;

    (e)  the nature, amount and date of any charges or encumbrances on any assets and the name of the persons entitled to such charges or encumbrances;

    (f)  any pending legal proceedings or legal actions which have been brought (other than these proceedings);

    (g)  any chattel;

    (h)  any pension fund or life insurance entitlement whether present or future, giving the value of the fund and the value of any right to withdraw a lump sum;

    (i)  any and all interests held (whether legally, beneficially or otherwise) in any company, partnership or joint venture;

    (j)  all trusts including discretionary trusts in respect of which the person is a settlor, trustee or beneficiary or is entitled to be considered by the trustees for an advancement or in respect of which the trustees habitually obey his instructions. Such details to include:

i)  the name of all trustees and beneficiaries or classes of beneficiaries;
ii)  the value and nature and location of all property subject to such trusts.

(6)  "Dealing" with assets or the Assets includes (but is not limited to):
    (a)  relinquishing or cancelling or varying any signing authority over any bank accounts over which he has signing authority or in respect of which he is a signatory on the mandate irrespective of whether there is any money in such accounts;
    (b)  relinquishing or cancelling or varying any power of attorney, directorship, office as trustee or other arrangement pursuant to which he has control of any asset which is not held in his name;
    (c)  relinquishing, cancelling or varying any arrangements whereby he is empowered to deal with assets which are not in his own name;
    (d)  in the case of a discretionary trust in respect of which the Respondents are a settlor or beneficiary or in respect of which the trustees are accustomed to act upon his wishes or directions;
    (e)  requesting the trustees (whether directly or indirectly) to make any distribution (whether income or capital);
    (f)  failing to withdraw any existing (but unexecuted) request, instruction or expression of wishes to the trustees to make any distribution under such Trust;
    (g)  selling, giving away, transferring, lending, devaluing, destroying or defacing or encumbering any asset;
    (h)  incurring debts or other financial liabilities to third parties.

(7)  Documents which relate to "details" of assets or the Assets include (but are not limited to) the following:
    (a)  banking Documents, including bank statements;
    (b)  documents of title to any real property or documents relating to property investments;
    (c)  documents relating to interests held in trusts;
    (d)  correspondence with accountants or financial advisers.

## SERVICE OF THIS ORDER

44.  The Court has provided a sealed copy of this order to the serving party:

Farrer & Co LLP, 66 Lincoln's Inn Fields, London WC2A 3LH, reference: Adrian Parkhouse

## COMMUNICATIONS WITH THE COURT

All communications to the court about this order should be sent to –

The Senior Associate, Fifth Floor, the Rolls Building, 7 Rolls Building, Fetter Lane, London EC4N 1NL, quoting the case number. The telephone number is 020 7947 6733. The office is open between 10 am and 4.30 pm Monday to Friday.

**SCHEDULE A**
**AFFIDAVITS**

The Applicant relied on the following affidavits -

| [name] | [number of affidavit] | [date sworn] | [filed on behalf of] |
|---|---|---|---|
| (1) Stephanie Overton | 1 | 18.5.2015 | Applicant |

**SCHEDULE B**

**UNDERTAKINGS GIVEN TO THE COURT BY THE APPLICANT**

(1) If the court later finds that this order has caused loss to the Respondents and decides that the Respondents should be compensated for that loss, the Applicant will comply with any order the court may make.

(2) As soon as practicable the Applicant will serve the claim form and this Order

(3) The Applicant will serve upon the Respondent as soon as practicable -

    (a) copies of the affidavits and exhibits containing the evidence relied upon by the Applicant, and any other documents provided to the court on the making of the application;

    (b) an application notice for continuation of the order; and

    (c) a Note of this hearing.

(4) Anyone notified of this order will be given a copy of it by the Applicant's legal representatives.

(5) The Applicant will pay the reasonable costs of anyone other than the Respondents which have been incurred as a result of this order including the costs of finding out whether that person holds any of the Respondents' assets and if the court later finds that this order has caused such person loss, and decides that such person should be compensated for that loss, the Applicant will comply with any order the court may make.

(6) If this order ceases to have effect the Applicant will immediately take all reasonable steps to inform in writing anyone to whom he has given notice of this order, or who he has reasonable grounds for supposing may act upon this order, that it has ceased to have effect.

(7) The Applicant will not without permission of the court use any information obtained as a result of this order for the purpose of any civil or criminal proceedings, either in England and Wales or in any other jurisdiction, other than this claim and for the purposes of civil proceedings in New York relating to the Assets.

(8) The Applicant will not without the permission of the court seek to enforce this order in any country outside England and Wales.

**UNDERTAKING GIVEN TO THE COURT BY FARRER & CO LLP**

(1) To comply with any order the Court may make in respect of the custody of Timothy Sammons' passports once received, and (subject to any contrary order of the Court) after 4pm on 21 May 2015 to return, upon the request of Timothy Sammons, any passports delivered up by him under paragraph 27 hereof.

**NAME AND ADDRESS OF APPLICANT'S LEGAL REPRESENTATIVES**

The Applicant's legal representatives are –

    Name:        Farrer & Co LLP
    Telephone:  020 3375 7000; out of office hours: 07825 275870
    Fax:         020 3375 7544
    Email:       adrian.parkhouse@farrer.co.uk

Reference:    Adrian Parkhouse

Contact – Adrian Parkhouse