UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
STEPHANIE OVERTON,                                    :
                                                      :   No. 15-CV-3927 (SAS)
                Plaintiff,                            :
                                                      :   ECF Case
             vs.                                       :
                                                      :
ART FINANCE PARTNERS LLC, AF FUNDING                  :
LLC, KNICKERBOCKER FUNDING LLC,                       :
CERULEAN ART LLC, and ANDREW ROSE,                    :
                                                      :
                Defendants.                           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
ART FINANCE PARTNERS LLC, AF FUNDING                  :
LLC, KNICKERBOCKER FUNDING LLC,                       :
CERULEAN ART LLC, and ANDREW ROSE,                    :
                                                      :
                Counterclaim Plaintiffs,              :
                                                      :
             vs.                                       :
                                                      :
STEPHANIE OVERTON,                                    :
                                                      :
                Counterclaim Defendant.               :
                                                      :
                                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF ANDREW ROSE IN FURTHER SUPPORT**

**OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

**ANDREW ROSE** declares the truth of the following under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.     I am a defendant in this matter and the managing member of Art Finance Partners LLC ("AFP"), AF Funding LLC ("AFF"), Knickerbocker Funding LLC and Cerulean Art LLC. As such, I have personal knowledge of the facts set forth herein and offer this declaration in further support of Defendants' Joint Motion for Partial Summary Judgment. I incorporate the Declarations that Knickerbocker, Cerulean and I submitted in opposition to Plaintiff's Motion for Partial Summary Judgment. I also ask that, to the extent relevant, the Court consider this Declaration in connection with Plaintiff's Motion for Partial Summary Judgment as Plaintiff suggests that the facts related to this motion are connected to her motion. (Pl Br. p. 23).

2.     Plaintiff argues that Defendants have conceded knowledge of Sammons' wrongdoing. I unequivocally state that Defendants had no knowledge of any wrongdoing on the part of Timothy Sammons or any of his entities until May 2015. Defendants have consistently denied such knowledge and all wrongdoing in the Answers filed herein, at my three days of deposition, at the deposition of Lauren Novtney, and Chris Krecke, and in Defendants' declarations in Opposition to Plaintiff's Motion for Partial Summary Judgment. As I described in Section A of my Declaration in Opposition to Plaintiff's Motion for Partial Summary Judgment, I was shocked, as was the art world in general, by the allegations against Sammons that came to light in May 2015.

**A.   Defendants Have Lost Substantial Sums Based on Sammons' Misrepresentations to Them**

3.     Plaintiff implies that Defendants made money from their dealings with Sammons, but does not have the temerity to say so, as it is false. As described in Defendants Opposition to Plaintiff's Partial Motion for Summary Judgment, (i) Cerulean paid fair market prices for each work it purchased (as shown in Exhibit A to our Opposition to Plaintiff's Motion for Partial Summary

1

Judgment, the valuation numbers Plaintiff cites in her motions are inconsistent with her own appraisals); and (ii) Sammons' has defaulted on millions of dollars of loans. (See Exhibit E to Defendants' Opposition Papers (M 008804 - 09), which are runs for each of the loans extended by Knickerbocker to Sammons/TSI).

4. Defendants' loss is demonstrable even accepting the numbers asserted by Plaintiff on pages 17-18 of her brief as true for the sake of argument. According to Plaintiff, Defendants loaned Sammons $4,875,000. According to Plaintiff (again accepted only for the sake of argument) $663,853 was deducted for "prepaid interest" "fees" and "expenses" (recall that Knickerbocker paid interest on money it loaned to Sammons and incurred expenses, but I will ignore those additional charges to Knickerbocker) and $141,714 was deducted to pay for extensions, for a total of approximately $800,000. We have seen that the only loan Sammons repaid was the Picasso/Chagall loan at $2 million. Thus, on Plaintiff's numbers, Sammons owes Knickerbocker almost $2 million ($4,875,000 - $800,000 - $2,000,000), not including interest. In addition, the acts of Sammons have caused us to incur legal fees in at least three litigations before this Court and with respect to other claims. We have lost nearly $3 million on the loans based solely on Plaintiff's numbers.

5. Plaintiff contends that if the transactions are allowed to stand Defendants will be allowed to maintain possession and control of "over $10 million of collateral." I have no idea where that number comes from and it is totally unsupported. It is true that we hope that the DA returns the loan collateral to Knickerbocker (the Court will recall that the DA allowed my counsel to confirm to the Court that disposition of the pieces would be decided by the Courts, not the DA). However, Knickerbocker cannot simply keep that collateral. It has obligations under the UCC with respect to loan collateral and would liquidate it to repay the Sammons' loans and then, if there is excess, properly dispose of it. The money would not be Knickerbocker's to keep. As shown above, at the

present time, Knickerbocker has suffered significant losses on the loans.

6. However, all of these issues are simply distractions. Whether we made money or lost money, whether there were red flags or not, does not determine anything on Defendants' motion. Accordingly, while I address some of the irrelevant allegations here, my silence in the fact of others should not be deemed agreement. Thus, for example, Plaintiff's 56.1 Statement consists overwhelmingly of "facts" related to transactions having nothing to do with this motion. I respectfully refer the Court to our answers to Plaintiff's Moving 56.1.

B. **The Loan Secured by the Picasso and Chagall**

7. As described in my moving Declaration, Knickerbocker extended a $2 million loan to Sammons and Timothy Sammons Inc. ("TSI"), secured by the Picasso and by a Chagall.

8. As also described in my moving Declaration, Sammons and TSI represented that they owned the works "free and clear of any lien, security interest, charge or encumbrance or interest of any other person…". (Ex. J). I believed those representations. Sammons had the pieces delivered to New York and he/TSI certainly appeared to own them and control them.

9. I thought he purchased them from Douglas Meyers from New Zealand. While Plaintiff acts as if I should have known Douglas Meyers did not live in New Zealand, I knew from the internet that Douglas Meyers was from there and it came as no surprise to me, since I believed Sammons purchased the art from him, that it was shipped from New Zealand.

10. Plaintiff contends that I must have known Sammons was lying about owning the art. I knew no such thing and there is no evidence (not a single document or a shred of testimony) to the contrary. It would have made no sense for Knickerbocker to lend money to Sammons if the collateral was at risk for claims of others and the events here prove it. These were expensive, known pieces. It is not as if an owner would forget about them or not pursue them if they were stolen. I

3

know litigation is expensive and even with clauses requiring payment of fees, the whole amount is often not awarded by the courts. Fights over collateral can be long and expensive. Meanwhile, Knickerbocker, which often borrows the money it lends to others, has to pay interest and/or fees to others. Thus, we have no interest in lending money when the collateral is suspect.

11. I reiterate that I never suspected Sammons was lying when he represented ownership with respect to any of the works, including (as relevant to this motion) the Picasso.

C. **The Structure of the Picasso/Chagall Loan**

12. One of the red herrings Plaintiff raises in her papers is her claim that the Picasso loan was not "straightforward." Plaintiff does not explain how this impacts the limited issues in Defendants' motion (or even the issues on Plaintiff's Motion). In any event, the Net Loan Proceeds Schedule dated December 8, 2014 sets forth certain charges and deductions applied to the loan proceeds. A true and correct copy of the Net Loan Proceeds Schedule is attached hereto as Exhibit G.[1] (Although the version is unsigned, it is identical to, and more legible than, the version signed and approved by Sammons, which is provided as page two of Exhibit G). There are fees and prepaid interest. These are standard in the loans of Knickerbocker to our clients. There was nothing unusual about fees and prepaid interest. ███████████████████████████████████████████.

13. Each of these deductions was specifically contemplated by and authorized under the Promissory Grid Note, Origination Agreement or Loan and Security Agreement. A true and correct copy of that Promissory Grid Note for the Picasso/Chagall loan is attached hereto as Exhibit H and a true and correct copy of the Origination Agreement for that loan is attached hereto as Exhibit I. A true and correct copy of the complete version of the Loan and Security Agreement (partially

---

[1] Defendants' moving papers attached exhibits A-F. These papers continue that lettering scheme.

produced as Ex. A in connection with Defendants' moving papers) is attached hereto as Exhibit J.

14. Section 2(a) of the Loan and Security Agreement (Ex. J) provides that from the $2 million loan, certain funds would be deducted for "(a) origination fees as provided in the Origination Agreement, (b) twelve (12) months of prepaid interest on the Loan, (c) transaction expenses relating to this Agreement and (d) Lender's good faith estimate for storage costs for the Property for the first year following the close date." These are standard terms in our agreements.

15. Section 1(b) of the Promissory Grid Note (Ex. H) sets forth that "[t]here will be no credit for prepaid interest before initial three month term." (Id.) In other words, under the term of the loan, the first year prepaid interest was non-refundable. Again, this provision is standard.

16. Plaintiff makes much of the amounts AFP received in fees and Knickerbocker received in prepaid interest, but this betrays a fundamental (and deliberate) blindness to how the business operates. As a threshold matter, those fees and prepaid interest pale in comparison to the amount at stake in the loans. It would make no sense for Knickerbocker to lend $2 million and have its money at risk, as it did with respect to the Chagall and Picasso, merely so it or AFP could receive a much lesser amount in fees and Knickerbocker could receive a lesser amount than the loan in interest, if Knickerbocker did not believe that the collateral was owned by Sammons/TSI and its loan was secure.

17. After contractual obligations were deducted at the inception of the loan, which established and serviced the loan and provided for the safety and security of the collateral, the remaining proceeds were disbursed exactly as called for under the contracts and as instructed by Sammons. At all times the net loan proceeds inured to the benefit of Sammons and TSI.

18. As reflected on the Net Proceeds Schedule (Ex. G), Sammons directed that of the $1,656,611 net loan proceeds, (i) $517,611 was used to exercise TSI's option to repurchase the

5

Calder work which had previously been sold to Cerulean; (ii) $350,000 was sent to Sammons' lawyer; and (iii) the remaining $789,000 in cash was wired to Sammons' bank account. While Plaintiff suggests that these disbursements rendered the loan not "straightforward," it is not unusual in my experience for a borrower to direct us to disburse funds to various third-parties.

19. ███████████████████████████████████████████████████████ ███████ This reinforces my point that AFF and Knickerbocker had obligations (████████ ████████ which make it important that we have good collateral.

20. Plaintiff contends that I supposedly knew that the Picasso was owned by a Sammons client and not Sammons. That is half right. I certainly did believe that at one point Sammons had purchased the Picasso from a client. However, in the Loan and Security Agreement (Ex. J) Sammons represented that he had good title and I believed him. At that point, December 2014, there was simply nothing at all that would make me think Sammons was anything less than honest.

21. In fact, Plaintiff's exhibits (Exhibit 7:06-07) reflect that in April 2015 I was calling Sammons to discuss his obligation to pay interest and Sammons was advising me that he had a big deal closing. Obviously, even in April 2015, I continued to believe in him.

**D.   Defendants Were Not Agents For Sammons or TSI**

22. Plaintiff alleges that "Rose … and Sammons essentially agreed … that Rose would be responsible for the marketing and sale of the Work in New York." (Pl. Br. at p. 8). This is not true and Plaintiff has no evidence that it is true since at no time did I agree, "essentially" or otherwise, to be responsible for the marketing and/or sale of the Picasso or any other work Sammons represented that he/TSI owned.

23. Pursuant to paragraph 2 of the Origination Agreement (Ex. I), to the extent that Sammons/TSI requested that AFP assist in securing a sale of the collateral, and such efforts were

successful, AFP would earn a commission equal to 10% of the purchase price.

24.     Although I tried to locate a buyer for the Picasso, my efforts were ultimately fruitless. Thus, AFP was not entitled to the 10% and was not paid any commission.

25.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ There is no evidence whatsoever to the contrary - just Plaintiff's speculation. Plaintiff cannot cite any facts to the contrary in her response to our 56.1 Statement. (See ¶¶ 6, 7).

26.     None of the Defendants received any commission in connection with Sammons' sale of the Picasso ▮▮▮▮▮▮ because none of the Defendants was involved in that sale. (See Correspondence ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ which was attached as Exhibit D to Defendants' Moving Papers). None of the Defendants were asked for any advice in connection with that sale, advised ▮▮▮▮▮▮▮▮▮▮▮▮, or marketed the Picasso ▮▮▮▮▮▮. Sammons would not have needed or sought my marketing ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ral).

27.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

28.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

. I note that Plaintiff obtained ▮▮▮▮▮ (as well as the almost 8,900 documents produced by Defendants during the course of this case) and nowhere is there evidence of any involvement by the Defendants ▮▮▮▮▮ Plaintiff blames me ▮▮▮▮▮ but only has speculation to support her argument.

29. Additionally, Plaintiff continually suggests that my request that SRI stay open until 6pm so that ▮▮▮▮▮, who I understand was on a flight from London to JFK which was landing at 4pm that day, could view the Picasso, was somehow nefarious. I made this purely ministerial request at the request of Sammons ▮▮▮▮▮. AFP often accommodates borrowers who wish to have someone view collateral that it is holding. It is not unusual to do so, and to refuse to do so may be construed as contrary to the lender's responsibilities under the applicable loan documents.

30. Nor is it somehow scandalous that Knickerbocker released the Picasso when the loan was paid off. Again, this is a ministerial act that is not discretionary. In fact, it would have been scandalous for Knickerbocker to retain the piece after the loan was repaid.

31. Plaintiff claims I "moved quickly" to get the Picasso sold. However, all of Plaintiff's allegations of my attempts to sell the Picasso <u>pre-date</u> the grand jury subpoena. ▮▮▮▮▮ did not relate to any transaction involving the Defendants', as noted above.

32. AFP held the Picasso between December 2014 and February 2015. At no time during those few months did Overton or anyone else demand the return of the Picasso (nor did Defendants have any contact or relationship with Overton).

E. **Plaintiff's Allegations Regarding the Grand Jury Subpoena**

33. Although irrelevant to Defendants' motion, Plaintiff again raises the grand jury

8

subpoena, which again, I thought was for a sales tax inquiry as had been reflected in the press (as shown in Exhibit B in Opposition to Plaintiff's Motion for Partial Summary Judgment). In connection with Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment, I personally submitted a declaration to the Court in which I denied Plaintiff's false suggestion that I had a discussion with Sammons or his attorney about the grand jury subpoena AFP received or that I had any involvement with, or knowledge of, changes to that lawyer's retainer agreement with Sammons. I reiterate those statements.

34. Plaintiff cites a February 1, 2015 email from Sammons in which Sammons states "I will ring tomorrow first thing I am afraid!" (Pl. 56.1 Counter-Stmt. ¶ 51). The context in which Plaintiff cites this email make it appear that she is suggesting: (i) that Sammons is referencing fear; and (ii) that Sammons is referencing the grand jury subpoena to AFP dated January 30, 2015 (which was not received by AFP until after that date). These irrelevant allegations are without factual basis and are just more rank speculation. In addition, I did not understand his email at the time I received it, nor do I understand it now, to convey fear. I have always read it to indicate that he is sorry he is going to call me first think in the morning ("I am afraid I'll need to ring you first thing tomorrow."). In any event, both the email and the grand jury subpoena post-date my efforts to sell the Picasso. At that point, Sammons [redacted].

F. **Plaintiff's Allegations Regarding the Fraudulent Sale Statement from Sammons**

35. I also previously addressed the "Sale Statement" dated November 10, 2014 that Plaintiff alleges was in Defendants' files and named Overton. As I explained in paragraphs 18 and 19 of my declaration in opposition, in December 2014 I received an email from Sammons with the subject "Invoice". The attachment to the email was a redacted bill of sale dated November 10, 2014, showing the sale of the Picasso, Chagall and Fontana to Sammons from a seller who's information was completely redacted. I do not recall seeing the unredacted invoice naming Overton until this

9

litigation. Even if I had, the documents represents that the seller of the works is Stephanie Overton of New Zealand, where I understood works had been shipped from. In any event, as I previously explained the invoice simply would have confirmed what I thought - that Sammons purchased the pieces from someone in New Zealand. Also, in this litigation we learned the property came from Meyers to Overton in a divorce

36. Plaintiff previously has alleged that this document was produced to the grand jury in February. In fact, it was produced in July.

37. Until this litigation, I had absolutely no knowledge of any agreements between Sammons and Overton or that he had breached any duties to her. I would not have assisted Sammons in any wrongdoing.

### G. Allegations of Spoliation

38. As I testified during one of my three days of deposition, prior to being contacted by counsel for Ms. Overton, I deleted emails in the ordinary course of business. After being contacted by counsel for Ms. Overton, to the best of my knowledge and belief, no documents related to Sammons were deleted. Certainly, I did not delete anything in an attempt to hide evidence. I steadfastly deny Plaintiff's allegation that I knowingly destroyed documents that I was required to maintain in the course of this litigation. Relevant here, the Picasso transaction occurred more than six months before I received the letter from Mr. Cahill.

39. I note that Plaintiff has subpoenaed more than twenty third-parties and received thousands of documents. None of those documents indicates I knew Sammons was involved in any wrongdoing earlier than May 2015 or that I doubted his representations.

40. I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

Date:  December 16, 2015
       New York, New York

By: /s/ Andrew C. Rose
    Andrew C. Rose