UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

STEPHANIE OVERTON,

               Plaintiff,

       - against -

ART FINANCE PARTNERS LLC, AF
FUNDING LLC, KNICKERBOCKER
FUNDING LLC, CERULEAN ART LLC,
and ANDREW ROSE,

             Defendants.

------------------------------------------------------------ X

ART FINANCE PARTNERS LLC, AF
FUNDING LLC, KNICKERBOCKER
FUNDING LLC, CERULEAN ART LLC,
and ANDREW ROSE,

             Counterclaim Plaintiffs,

       - against -

STEPHANIE OVERTON,

             Counterclaim Defendant.

------------------------------------------------------------ X

## OPINION AND ORDER

### 15-cv-3927 (SAS)

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.   INTRODUCTION

On May 21, 2015, Stephanie Overton brought this diversity action against various defendants for their alleged participation in an art fraud perpetrated by non-party Timothy Sammons and his affiliated companies. Overton subsequently dismissed some defendants and added others, filing her First Amended Complaint on July 9, 2015. The current defendants in this action are one individual, Andrew Rose, and four corporate entities that Overton alleges are "extensions" of Rose: Art Finance Partners LLC ("AFP"), AF Funding LLC ("AFF"), Knickerbocker Funding LLC ("Knickerbocker"), and Cerulean Art LLC ("Cerulean") (with Rose, the "defendants" and without Rose, the "corporate defendants").[1]

There are six artworks at issue, created by Marc Chagall (the "Chagall"), Raoul Dufy (the "Dufy"), Amedeo Modigliani (the "Modigliani"), Henry Moore (the "Moore"), Pablo Picasso (the "Picasso"), and Tom Wesselmann (the "Wesselmann") (the "Works").[2] The First Amended Complaint contains eight

---

[1]     First Amended Complaint at 11. *Accord* Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment ("Pl. Mem.") at 22.

[2]     The original and First Amended Complaints also contain allegations relating to works by Lucio Fontana (the "Fontana") and Rene Magritte (the "Magritte"). No Magritte-related claims were ever asserted against defendants, and Overton has dismissed all Fontana-related claims. Since September 2015, the Chagall, Dufy, Modigliani, and Wesselmann have been in the custody of law enforcement, in connection with an ongoing criminal investigation.

claims — asserted against some or all defendants — for replevin, declaratory judgment, conversion, aiding and abetting breach of fiduciary duty and fraud, and unjust enrichment.

On November 16, 2015, the parties filed cross-motions for partial summary judgment.[3]  Overton seeks a judgment

> (A) Declaring that the Chagall, Dufy, Modigliani, Moore, and Wesselmann Works are (i) owned solely by Overton and (ii) are not subject to any liens, encumbrances, or valid title claims by the defendants; and
> (B) Awarding Overton compensatory and punitive damages for Rose's conversion of the Works and her loss of the Picasso due to Rose aiding and abetting torts by Sammons.[4]

Although Overton does not specify the claims for which summary judgment is sought, she appears to be moving as to liability on her First, Second, Third, Fourth, Fifth, Sixth, and Seventh Claims.[5]  Additionally, Overton seeks to impose alter ego liability on Rose and the corporate defendants.  Defendants seek summary judgment on (1) all claims relating to the Picasso (the Second, Third, Fourth, and Eighth Claims) and (2) the Eighth Claim as it relates to all of the Works.

---

[3]     Although certain of Overton's claims are asserted against one defendant only, the five defendants submitted joint briefing.

[4]     Pl. Mem. at 3.

[5]     Overton does not make any arguments regarding her Eighth Claim for unjust enrichment.

For the following reasons, Overton's motion is GRANTED in part and DENIED in part, and defendants' motion is DENIED in full.

## II.      BACKGROUND[6]

### A.      Overton's Relationship with Sammons

During their marriage, Overton and her former husband, Sir Arthur Douglas Myers, acquired the following Works:[7]

- Marc Chagall, *Reverie*, gouache on paper, 79 x 58 cm;

- Raoul Dufy, *Syracuse* or *Chateau sur La Cote*, watercolor, pencil, and gouache on paper, 48 x 64 cm;

- Amedeo Modigliani, *Cariatide Rouge Sur Fond Noir*, pencil and gouache on paper, 62 x 42 cm;

- Henry Moore, *Reclining Figure*, bronze, 9 x 15 x 7 cm;

- Pablo Picasso, *Buste de Femme* or *Tete de Femme* or *Buste en Femme*, oil on canvas, 33 x 24 cm; and

- Tom Wesselmann, *Collage for Study for the Mouth, no. 10*, Liquitex on paper on board, 40 x 38 cm.

---

[6]      The following facts are drawn from the parties' Rule 56.1 Statements and responses, as well as from other supporting documentation submitted in connection with the summary judgment briefing.  Additional facts are described, as relevant, in the discussion section of this Opinion.

[7]      *See* Plaintiff's Rule 56.1 Statement of Material Facts in Support of Plaintiff's Motion for Summary Judgment ("Pl. 56.1") ¶¶ 1-2.

When their marriage ended in the 1980s, Overton received sole title to the Works.[8]

In 2007 or 2008, Overton contemplated selling some of her artwork, and was referred to Timothy Sammons, an individual who operated United Kingdom-based Timothy Sammons Ltd. ("Sammons UK") and Timothy Sammons Fine Art Agents ("TSFAA UK") and New York-based Timothy Sammons, Inc. ("TSI NY").[9]  As part of their initial communications, Sammons sent Overton a letter stating, *inter alia*, that "[w]e have offices in the two main centers of selling – London and New York" and that he and his companies "act only as agents on behalf of a principal who is either the buyer or the seller."[10]

### 1.    The Modigliani

In 2008, Overton delivered the Modigliani to Sammons, along with other artworks not at issue in this case.[11]  Overton claims that she entrusted these pieces to Sammons UK only, whereas defendants assert that they were held

---

[8]       *See id.* ¶ 3.

[9]       *See id.* ¶¶ 4-5; Declaration of Stephanie Overton ("Overton Decl.") ¶ 5.

[10]      2/5/08 Letter from Sammons to Overton ("2/5/08 Sammons-Overton Letter"), Ex. B to Overton Decl., at 2, 4.  *Accord* Pl. 56.1 ¶¶ 6-7.

[11]      *See* Pl. 56.1 ¶ 8.

pursuant to an agreement between Overton and TSI NY.[12]  In connection with this delivery, Sammons informed Overton on April 4, 2008:  "I confirm that all times we will hold any pictures delivered to us by you . . . , and nothing in this Agreement nor this letter can give us authority to sell or transfer title on your behalf."[13]  This April 4, 2008 letter included Sammons' London and New York addresses in the contact information section.[14]

### 2.    The Dufy, Moore, and Wesselmann

Overton delivered the Moore to Sammons in July 2013,[15] followed by the Dufy and Wesselmann in August 2013.[16]  Again, Overton claims that these pieces were entrusted to Sammons UK, whereas defendants assert that she entrusted them to TSI NY.[17]

---

[12]    *See id.*; Defendants' Joint Responses to Plaintiff's Rule 56.1 Statement ("Defs. Responses to Pl. 56.1") ¶ 8.

[13]    Pl. 56.1 ¶ 8 (quoting 4/4/08 Letter from Sammons to Overton ("4/4/08 Sammons-Overton Letter"), Ex. B to Overton Decl., at 6).

[14]    *See* 4/4/08 Sammons-Overton Letter at 5.

[15]    *See* Pl. 56.1 ¶ 10; 7/18/13 TSFAA UK Receipt, Ex. B to Overton Decl., at 12.

[16]    *See* Pl. 56.1 ¶ 10; 8/21/13 TSFAA UK Shipping Invoice, Ex. F to Declaration of Defendants' Attorney, Christopher Greeley ("Greeley Decl."), at 394.

[17]    *See* Pl. 56.1 ¶ 10; Defs. Responses to Pl. 56.1 ¶ 10 (citing 11/22/13 Agreement Between Stephanie Overton and Timothy Sammons ("11/22/13

Overton states that she delivered the Moore to Sammons UK (in London),[18] although the receipt for this delivery again includes Sammons' London and New York addresses in the contact information section.[19]  The shipping invoice for the Dufy and Wesselmann designates TSI NY (in New York) as the intended recipient.[20]  Overton denies seeing this shipping invoice prior to the litigation.[21]  Further, a November 22, 2013 consignment agreement applicable to all three Works lists Sammons' London and New York addresses on the cover page, uses TSI NY's address in the introduction, and defines "'we,' 'us,' 'our,' and 'TSI'" as "Timothy Sammons Inc[.] and any affiliated company."[22]

_____

Overton-TSFAA UK Agreement"), Ex. B to Overton Decl., at 8-9).

[18]    *See* Pl. 56.1 ¶ 10; Overton Decl. ¶ 13.

[19]    *See* 7/18/13 TSFAA UK Receipt at 12.

[20]    *See* 8/21/13 TSFAA UK Shipping Invoice, Ex. F to Greeley Decl., at 394.

[21]    *See* Plaintiff's Response to Defendants' Rule 56.1 Statement ("Pl. Response to Defs. 56.1") ¶ 12.

[22]    11/22/13 Overton-TSFAA UK Agreement at 8-9.  Overton's November 16, 2015 declaration describes this document as her consignment agreement with Sammons as to the Chagall, Dufy, and Wesselmann — an assertion that defendants do not seem to dispute.  *See* Overton Decl. at 3.  However, the executed signature page of this agreement is dated April 29, 2014 (rather than November 22, 2013).  *See* 11/22/13 Overton-TSFAA UK Agreement at 10.  Given that neither party has identified or provided an explanation for this discrepancy, the Court disregards the April 29, 2014 signature page for purposes of this Opinion.

### 3.      The Chagall and Picasso

The following year, Overton also delivered the Chagall and Picasso to Sammons.[23]  Overton avers that she sent these Works to Sammons simply for storage and insurance in London (and not in contemplation of their sale).[24]  This delivery is memorialized by an insurance receipt issued by TSFAA UK on December 2, 2014, which again includes Sammons' addresses in London and New York.[25]

### 4.      Recording of Overton's Consignments to Sammons

During depositions, Overton testified that she "[did not] think she . . . ever publicized" the fact that Sammons was holding her artwork, explaining that she chose not to "publicize her private life."[26]  Accordingly, Overton did not — "[a]t any point in time" — file Uniform Commercial Code statements, publish periodical listings, or otherwise provide notice that she was the owner of the Works placed in Sammons' custody.[27]

---

[23]     *See* Pl. 56.1 ¶ 11; Overton Decl. ¶¶ 15-16.

[24]     *See* Pl. 56.1 ¶ 11; Overton Decl. ¶¶ 15-16.

[25]     *See* 12/2/14 TSFAA UK Receipt, Ex. B to Overton Decl., at 13.

[26]     6/18/15 Deposition of Stephanie Overton, Ex. L to Greeley Decl., at 105:9-10, 105:18.

[27]     *Id.* at 105:8.  *Accord id.* at 104:17-106:2.

B.     **Relationship Among the Defendants**

Rose, whose former employers have included the Christie's and

Sotheby's auction houses, is the sole member of each corporate defendant.[28]  All of

the corporate defendants are incorporated in Delaware.[29]  Cerulean, AFF, and

Knickerbocker use either Rose's personal residence in Delaware or AFP's New

York offices to conduct business.[30]  At least some of the corporate defendants have

lines of credit between one another.[31]

During depositions, Rose testified that Cerulean allows AFP to act as

its agent for acquiring art, and that Cerulean is named as a loss payee on AFP's

insurance policy.[32]  Further, Rose stated that Cerulean "[a]bsolutely" owns more

than one hundred works of art and "probably" owns over one thousand art and

non-art items.[33]  Additionally, Rose stated that Cerulean has not made any

---

[28]     *See* Pl. 56.1 ¶¶ 41, 46-47.

[29]     *See* Defendants' Joint Memorandum of Law in Opposition to
Plaintiff's Motion for Partial Summary Judgment ("Opp. Mem.") at 22.

[30]     *See* Pl. 56.1 ¶ 187.

[31]     *See id.* ¶ 196.

[32]     *See* 6/10/15 Deposition of Andrew Rose ("6/10/15 Rose Dep."), Ex. C
to Declaration of Plaintiff's Attorney, John Cahill ("Cahill Decl."), at 20:9-10,
31:14-32:6.

[33]     *Id.* at 39:4-11.

purchases requiring the payment of New York sales tax.[34]  Rose also explained that

AFF and AFP function as lenders,[35] and stated, "[t]ypically, we lend 40 to 50

percent of the value of the work of art that we have as [sic] physical possession as

collateral."[36]  In addition, Rose explained that he "occasionally act[s] as an adviser

to friends or family purchasing or selling works of art."[37]

### C.     Relevant Transactions Involving Defendants and Sammons

Rose testified that he first encountered Sammons when he worked in

the auction industry, and that he has known Sammons for approximately twenty

years.[38]  Between 2014 and 2015, defendants entered into several purchase and

loan agreements with Sammons and his affiliated entities, which Overton now

asserts interfered with her ownership of the Works.  Defendants maintain that they

believed Sammons had title to the Works and authority to enter into these

agreements.

### 1.     Defendants' Purchases of the Dufy, Moore, and Wesselmann

---

[34]     *See id.* at 33:7-21.

[35]     *See id.* at 50:17-51:3.

[36]     *Id.* at 140:12-14.

[37]     *Id.* at 48:19-21.

[38]     *See id.* at 92:9-11.

On approximately February 5, 2014, Rose and Sammons executed a bill of sale for five artworks — including the Dufy and Wesselmann — which reflected that the seller of these Works was TSFAA UK, reachable at TSI NY's address.[39]  Rose also sent Sammons a separate agreement providing Sammons with the right to repurchase the five pieces, at a price ten-percent higher than Rose's purchase price and with compounded monthly interest.[40]  The bill of sale did not include individual purchase prices.[41]  Rather, Cerulean purchased the lot for $360,000, which defendants state reflected the aggregate "approximate market price."[42]  The parties now offer competing valuations for the Works.[43]  On February 6, 2014, Knickerbocker wired $360,000 to Sammons, which defendants state was credited back to Knickerbocker from Cerulean that same day.[44]

Rose testified that his pre-transaction due diligence regarding Sammons' ownership of the Dufy and Wesselmann involved:  "check[ing] the

---

[39]     *See* Pl. 56.1 ¶ 18.  *See also* 2/5/14 Bill of Sale from TSFAA UK to AFP LLC as Agent ("2/5/14 Bill of Sale"), Ex. F to Cahill Decl., at 3.

[40]     *See* Pl. 56.1 ¶ 18.

[41]     *See id. ¶¶* 19-24.

[42]     Defs. Response to Pl. 56.1 ¶ 23.

[43]     *See id.* ¶¶ 19-24; Pl. 56.1 ¶¶ 19-24.

[44]     *See* Pl. 56.1 ¶ 24; Defs. Response to Pl. 56.1 ¶ 24.

UCC websites to be sure there were no liens against them," "Googl[ing],"

"check[ing] the Catalogue Raisonné"[45] for the Dufy, and "check[ing] . . . [his]

Wesselmann archives for information on the Wesselmann."[46]  He further stated that

he "[did not] know what other lien search one could have done" and that Sammons

had provided him with "a bill of sale . . . repping and warranting that [Sammons]

had good title."[47]

       Several days later, on approximately February 10, 2014, Rose and

Sammons executed a bill of sale for the Moore, which similarly included

representations regarding Sammons' ability to transfer good title, provided that the

---

[45]     The website of the International Foundation for Art Research
("IFAR") explains that "[c]atalogues raisonnés — scholarly compilations of an
artist's body of work — are critical tools for researching the provenance and
attribution of artwork."  IFAR, *Catalogues Raisonnés*,
https://www.ifar.org/cat_rais.php.  Additionally, the website provides the
following background about the organization:

       IFAR was established in 1969 to fill a need for an impartial and
       scholarly body to educate the public about problems and issues in
       the art world and to research the attribution and authenticity of
       works of art.  In the 1970s, IFAR's purview expanded to include
       art theft and looting. . . . In 1991, the IFAR helped create the "Art
       Loss Register" . . . [and now] works closely with the [Art Loss
       Register] to prepare the "Stolen Art Alert" section of the *IFAR
       Journal*.  IFAR, *About IFAR*, https://www.ifar.org/about.php.

[46]     6/10/15 Rose Dep., Ex. N to Greeley Decl., at 215:3-216:14.

[47]     *Id.* at 216:2-4, 216:21-22.

seller was TSFAA UK, reachable at TSI NY's address, and was accompanied by a separate agreement providing Sammons with the right to repurchase under certain terms.[48]  Cerulean wired Sammons $150,000, although the parties again dispute the true value of the Work.[49]  Pursuant to this bill of sale, the Moore was to be "immediately shipped from London to [AFP NY]."[50]  Defendants maintain that although AFP served as Cerulean's agent for both February 2014 purchases, the Works were to be accepted by their purchaser, Cerulean, in Delaware.[51]

### 2.   Defendants' Acceptance of the Modigliani, Chagall, and Picasso as Collateral

#### a.   The Modigliani Loan

In July 2014, Knickerbocker entered into a loan agreement with TSI NY and Sammons.[52]  Pursuant to this agreement, Knickerbocker provided TSI NY and Sammons with a $325,000 loan.[53]  The agreement provided that "the Borrowers" — defined as TSI NY and Sammons individually — furnished the

---

[48]     *See* Pl. 56.1 ¶ 25; 2/10/14 Bill of Sale from TSFAA UK to AFP LLC as Agent ("2/10/14 Bill of Sale"), Ex. F to Cahill Decl.

[49]     *See* Pl. 56.1 ¶ 27; Defs. Response to Pl. 56.1 ¶¶ 20, 26, 29.

[50]     Pl. 56.1 ¶ 28 (quoting 2/10/14 Bill of Sale at 6).

[51]     *See* Defs. Response to Pl. 56.1 ¶ 28.

[52]     *See id.* ¶ 151.

[53]     *See id.*; Pl. 56.1 ¶¶ 131, 146, 150.

collateral "free and clear of any lien, security interest, charge or encumbrance or interest of any other person (including, without limitation, any interest as consignor)."[54]  On July 2, 2014, AFP filed a UCC-1 Financing Statement listing the Modigliani as collateral.[55]

Rose testified that, in connection with the signing of this loan agreement, Sammons "told [him] that he owned" the Modigliani.[56]  Additionally, Rose testified that "at some point in time[, he] ask[ed Sammons] the provenance [of the Modigliani], and [Sammons] said it came directly — or he had received it — purchased it directly from the people who had bought it at Sotheby's in the 70s."[57]

### b.    The Picasso and Chagall Loan

On December 3, 2014, Knickerbocker entered into another loan agreement with TSI NY and Sammons.[58]  Defendants assert that pursuant to this agreement, TSI and Sammons pledged the Picasso and Chagall as collateral for a

---

[54]    7/1/14 Loan and Security Agreement, Ex. M to Cahill Decl., at 4.

[55]    *See* Pl. 56.1 ¶ 154.

[56]    9/16/15 Deposition of Andrew Rose, Ex. O to Greeley Decl., at 70:14-18.

[57]    *Id.* at 82:11-15.

[58]    *See* Defendants' Joint Statement of Undisputed Facts in Support of Its Motion for Partial Summary Judgment ("Defs. 56.1") ¶ 1.

two million dollar loan.[59]  Plaintiff disputes the existence of a two million dollar loan and instead contends that, after fees and expenses, Knickerbocker furnished a maximum of $789,000, wired to AFF (not TSI NY or Sammons).[60]

Like the Modigliani agreement, this agreement provided that "the Borrowers" — defined as TSI NY and Sammons individually — furnished the collateral "free and clear of any lien, security interest, charge or encumbrance or interest of any other person (including, without limitation, any interest as consignor)."[61]  On approximately December 3, 2014, the Picasso was delivered to AFP's warehouse in New York.[62]

### 3.    Sammons' Sale of the Picasso to Skarstedt

On February 12, 2015, Rose emailed AFP's warehouse requesting that it be kept open after hours, at Sammons' expense, so that a representative from Skarstedt Gallery could examine the Picasso.[63]  At least some correspondence

---

[59]    *See id.* ¶ 2.

[60]    *See* Pl. Response to Defs. 56.1 ¶ 1; Plaintiff's Rule 56.1 Statement of Additional Material Facts ("Pl. Supp. 56.1") ¶¶ 100-101; 12/8/14 Net Loan Proceeds Schedule Between AFP and Timothy Sammons ("12/8/14 Net Loan Proceeds Schedule"), Ex. L to Cahill Decl., at 6.

[61]    12/3/14 Loan and Security Agreement, Ex. L to Cahill Decl., at 4.

[62]    *See* Pl. 56.1 ¶ 171; Defs. 56.1 ¶ 4.

[63]    *See* Pl. 56.1 ¶ 181.

regarding this prospective sale took place between Skarstedt and Sammons.[64]

On February 19, 2015, Skarstedt purchased the Picasso from Sammons for $1,600,000, wiring $1,550,000 of its payment to AFP on February 20, 2015.[65]  Defendants maintain that the wire transfer to AFP was credited towards Knickerbocker's Picasso-secured loan to Sammons.[66]  On February 24, 2015, Rose emailed a Skarstedt employee to inform her that the "Picasso [was] cleared for pickup,"[67] and the Picasso was released to Skarstedt that same day.[68] On March 6, 2015, Skarstedt sold the Picasso to a third party.[69]

### 4.     Sammons' Sale of the Chagall to Rose

On February 20, 2015, Rose and Sammons executed a bill of sale for the Chagall, designating a purchase price of $600,000 with no sales tax due.[70]  The

---

[64]     *See* 1/15/15 Email from "bona@skarstedt.com" to "timothy@timothy-sammons.co.uk," Ex. D to 12/16/15 Declaration of Andrew Rose ("12/16/15 Rose Decl.").

[65]     *See* Pl. 56.1 ¶ 182; Defs. 56.1 ¶ 6.

[66]     *See* Defs. Responses to Pl. 56.1 ¶ 182.

[67]     Pl. Supp. 56.1 ¶ 61.

[68]     *See* Defs. 56.1 ¶ 10.

[69]     *See id.* ¶ 12.

[70]     *See* Pl. 56.1 ¶ 93; Defs. Response to Pl. 56.1 ¶ 94 (citing 2/20/15 Bill of Sale from TSFAA UK to AFP LLC as Agent ("2/20/15 Bill of Sale"), Ex. L to Cahill Decl., at 7).

bill of sale listed the purchaser as AFP "as agent," reachable at a Delaware address.[71]  Five days later, Cerulean wired $70,000 to Sammons with the message: "CHAGALL REVERIE PAID IN FULL."[72]  Rose testified that the difference between the purchase price and wire transfer amount was credited towards Knickerbocker's Chagall-secured loan to Sammons, such that Sammons received the entire benefit of the $600,000 sale.[73]

### D.    Sammons Investigation

Rose first learned of a criminal investigation of Sammons on January 30, 2015, when AFP received a grand jury subpoena.[74]  Rose avers that, at the time, he believed that this subpoena related to an ongoing sales tax investigation into galleries and clients across New York.[75]  Two civil cases also were initiated against Sammons in January and November 2014, respectively.[76]

---

[71]    2/20/15 Bill of Sale at 7.

[72]    Pl. 56.1 ¶ 94 (quoting 2/25/15 Bank of America Receipt, Ex. L to Cahill Decl., at 9).

[73]    *See id.* ¶ 96; Defs. Response to Pl. 56.1 ¶ 96.

[74]    *See* Pl. 56.1 ¶ 108.

[75]    *See* Defs. Response to Pl. 56.1 ¶ 108; *Thomas C. Danzinger & Georges G. Lederman*, "New York DA Launches Secret Art Sales Tax Investigation," ArtNet News, Jan. 22, 2015 ("1/22/15 ArtNet News Article"), Ex. B to Greeley Decl.

[76]    *See* Pl. 56.1 ¶¶ 86, 143.

## III.    LEGAL STANDARD

Summary judgment is appropriate where, "viewing the record in the light most favorable to the non-moving party . . . 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"[77]  "In making this determination . . . we resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."[78]  "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[79]

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact."[80]  To defeat a motion for summary judgment, the non-moving party must "'do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory

---

[77]    *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting Fed. R. Civ. P. 56(a)) (quotation marks and citation omitted).

[78]    *Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir. 2015) (quotation marks and citation omitted).

[79]    *Windsor v. United States*, 699 F.3d 169, 192 (2d Cir. 2012), *aff'd*, 133 S.Ct. 2675 (2013) (quotation marks, citation, and alterations omitted).

[80]    *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

allegations or unsubstantiated speculation.'"[81]  "If the non-moving party has the
burden of proof on a specific issue, the movant may satisfy its initial burden by
demonstrating the absence of evidence in support of an essential element of the
non-moving party's claim."[82]

"'The function of the district court in considering the motion for
summary judgment is not to resolve disputed questions of fact but only to
determine whether, as to any material issue, a genuine factual dispute exists.'"[83]
"'Credibility determinations, the weighing of the evidence, and the drawing of
legitimate inferences from the facts are jury functions, not those of a judge.'"[84]

## IV.   APPLICABLE LAW

### A.      The Merchant Entrustment Rule[85]

---

[81]      *Robinson*, 781 F.3d at 44 (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d
347, 358 (2d Cir. 2011)).

[82]      *Chen v. New Trend Apparel*, 8 F. Supp. 3d 406, 430 (S.D.N.Y. 2014)
(citing *Celotex v. Catrett*, 477 U.S. 317, 325 (1986) (further citations omitted)).

[83]      *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (quoting
*Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)).

[84]      *Crawford*, 758 F.3d at 486 (quoting *Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 255 (1986)).

[85]      "[B]ecause this is a diversity action," the Court applies the law of "the
forum in which [it] sits" — here, New York.  *Ash v. Richards*, 572 Fed. App'x 52,
53 (2d Cir. 2014).  Further, the parties appear to concede the applicability of the
UCC and other New York law throughout their briefs.  *See Krumme v. WestPoint
Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (holding that parties' briefing,

### 1.    Generally

"Sales of artwork are governed by [New York's version of] the Uniform Commercial Code [("UCC")], which provides that a purchaser generally acquires only the title which a seller had."[86]  A thief cannot pass good title.[87] However, "'[u]nlike a thief, an entrustee — *i.e.*, someone to whom property has been entrusted by its owner — has voidable, as opposed to void, title, and therefore *can* pass good title to a third party.'"[88]

This is codified in Section 2–403(2) of the UCC, which provides that "[a]ny entrusting of . . . goods to a merchant who deals in goods of that kind gives [the merchant] power to transfer all rights of the entrustor to a buyer in the ordinary course of business."[89]  The UCC further provides that entrustment

---

which assumed the applicability of New York law, constituted implied consent to New York law) (quotation marks and citation omitted).

[86]    *Dorothy G. Bender Found., Inc. v. Carroll*, 975 N.Y.S.2d 708, at *6 (Sup. Ct. N.Y. Cty. 2013) (citing N.Y. U.C.C. § 2–403(1)).

[87]    *See, e.g.*, *Bakalar v. Vavra*, 619 F.3d 136, 140 (2d Cir. 2010).

[88]    *Zaretsky v. William Goldberg Diamond Corp.*, 69 F. Supp. 3d 386, 389-90 (S.D.N.Y. 2014) (quoting *Interested Lloyd's Underwriters v. Larry Ross*, No. 04 Civ. 4381, 2005 WL 2840330, at *5 (S.D.N.Y. Oct. 28, 2005)) (emphasis added).

[89]    "Merchant" and "buyer in the ordinary course of business" are terms of art used within the UCC.  The definitions of these terms are discussed *infra* at Section IV(A)(2).

"includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence."[90] Accordingly, if an owner entrusts his property to a merchant, the owner is estopped from later seeking replevin against a buyer in the ordinary course of business — even if the sale was the product of "fraud punishable as larcenous under the criminal law."[91]

The purpose of the merchant entrustment rule is to "'enhance the reliability of commercial sales by merchants who deal in the kind of goods sold by shifting the risk of resale to one who leaves his property with [a] merchant.'"[92] Put differently, the rule is designed to protect good faith "buyers in the ordinary course of business"[93] and incentivize owners "to carefully 'select the merchant to whom [they] entrust[] [their] property.'"[94]

---

[90]   N.Y. U.C.C. § 2–403(3).  *Accord Graffman v. Espel*, No. 96 Civ. 8247, 1998 WL 55371, at *3 (S.D.N.Y. Feb. 11, 1998) ("Even where an agent has violated [a principal's] instructions, Section 2-403 may operate to bind the principal such that the purchaser acquires good title from the principal's agent.") *aff'd sub nom. Graffman v. Doe*, 201 F.3d 431 (2d Cir. 1999).

[91]   *Id.* § 2–403(1).

[92]   *Zaretsky*, 69 F. Supp. 3d at 389 (quoting *Graffman*, 1998 WL 55371, at *3).

[93]   N.Y. U.C.C. § 2–104(9).

[94]   *Zaretsky*, 69 F. Supp. 3d at 390 (alteration in original) (quoting *Porter v. Wertz*, 53 N.Y.2d 696, 698 (1981)).

### 2.    UCC Definitions of "Merchant" and "Buyer in the Ordinary Course of Business"

The UCC defines "merchant" as:

> a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.[95]

Further, the UCC defines "buyer in the ordinary course of business" as "a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person, other than a pawnbroker, in the business of selling goods of that kind."[96]  Excluded from this definition are persons who acquire goods "as security for or in total or partial satisfaction of a money debt."[97]  Further, "[a] defendant's status as a buyer in the ordinary course is an affirmative defense."[98]

### 3.    Heightened Duty of Merchant-Purchasers

Although the UCC generally defines "good faith" as "honesty in fact

---

[95]    N.Y. U.C.C. § 2–104(1).

[96]    *Id.* § 2–104(9).

[97]    *Id.* § 1–201(b)(9).

[98]    *Chen*, 8 F. Supp. 3d at 453.

in the transaction or conduct concerned,"[99] when applied to the conduct of

merchants, the UCC also requires "the observance of reasonable commercial

standards of dealing in the trade."[100]

> Given their knowledge of the practices of their trade, merchants
> or dealers, when acting as purchasers, are held to this 'heightened
> standard' of commercial reasonableness in part to prevent them
> from shielding their purchase of stolen or misappropriated goods
> behind the assertion that they acted in good faith.[101]

Accordingly, in applying the merchant entrustment rule, "New York

courts have held that . . . a merchant purchaser may have a duty to inquire into the

provenance or ownership of the merchandise [being sold] where there are 'warning

signs' or 'red flags' indicating problems with the sale."[102]  "An art dealer who

proceeds to purchase artwork from another dealer in the presence of such red flags,

without making a diligent inquiry as to the provenance of the work in question,

---

[99]    N.Y. U.C.C. § 1–201(b)(20).

[100]    *Id.* § 2–103(1)(b).  *Accord Dorothy G. Bender*, 975 N.Y.S.2d at *6.

[101]    *Dorothy G. Bender*, 975 N.Y.S.2d at *6.  *Accord Davis v. Carroll*,
937 F. Supp. 2d 390, 423 (S.D.N.Y. 2013) ("Merchants are thus held 'to a higher
standard of good faith.'") (quoting *Brown v. Mitchell-Innes & Nash, Inc.*, No. 06
Civ. 7871, 2009 WL 1108526, at *5 (S.D.N.Y. Apr. 24, 2009)) (further quotation
marks omitted).

[102]    *Dorothy G. Bender*, 975 N.Y.S.2d at *7 (citing *Davis*, 937 F. Supp. 2d
at 423; *Carroll v. Baker*, 889 F. Supp. 2d 593, 604 (S.D.N.Y. 2012)) (further
citations omitted).

will therefore not qualify as a 'buyer in the ordinary course' whose title is protected by UCC 2–403(2)."[103]  Although "New York law does not expressly identify the triggers of a duty of heightened inquiry in the art industry," courts have enumerated four "possible red flags" in this context:

> (1) whether the sale price is obviously below market, (2) whether the negotiations or procedure of the sale differed from previous transactions between buyer and seller, (3) whether the buyer was aware of the seller's financial difficulties, or (4) whether the buyer would have reason to doubt the seller's ownership of the artwork.[104]

## C.   Rights of Creditors to Consigned Goods

"The law of consignments is governed by the . . . UCC."[105]  Pursuant to UCC Section 9–319(a), a secured creditor of a consignee may take a superior

---

[103]   *Id.  Accord Davis*, 937 F. Supp. 2d at 423 (explaining that permitting "'commercial indifference to ownership or the right to sell . . . facilitates traffic in stolen works of art'") (quoting *Porter v. Wertz*, 416 N.Y.S.2d 254, 257 (1st Dep't 1979)).

[104]   *Davis*, 937 F. Supp. 2d at 425-26 (citing *Baker*, 889 F. Supp. 2d at 604).  *Accord Kozar v. Christie's, Inc.*, 929 N.Y.S.2d 200, at *8 (Sup. Ct. Westchester Co. May 18, 2011) ("While the precise parameters of the obligation owed by a dealer in art have not been fully defined, it appears to be generally accepted that, as a minimum requirement, a merchant dealing in art work would be under a duty to make a further inquiry as to a painting's ownership in the event there are suspicious circumstances underlying the transaction, such as a bargain basement price.") (citation omitted).

[105]   *In re Morgansen's LTD*, 302 B.R. 784, 787 (E.D.N.Y. 2003).

-24-

interest to the consignor in the consignor's property, with certain exceptions.[106]

"Because UCC Section 9–319 applies to consignments, its applicability turns on whether the transaction is a consignment as defined in UCC Section 9–102(a)(20),"[107] which provides that:

> "Consignment" means a transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale; and . . . the merchant:  (i) deals in goods of that kind under a name other than the name of the person making delivery; (ii) is not an auctioneer; and (iii) is not generally known by its creditors to be substantially engaged in selling the goods of others.[108]

"[I]n the Second Circuit, the burden of proof falls on the party claiming applicability of § 9–102(a)(20) to show that each element of the definition is satisfied."[109]  "'The purpose of . . . UCC §§ 9–102(a)(20) and 9–319(a) [are] to protect general creditors of the consignee from claims of consignors that have undisclosed consignment arrangements with the consignee that create secret liens on the inventory.'"[110]

---

[106]     *See* N.Y. U.C.C. § 9–319.

[107]     *In re Salander-O'Reilly Galleries, LLC*, 475 B.R. 9, 24 (S.D.N.Y. 2012).

[108]     N.Y. U.C.C. § 9–102(a)(20).

[109]     *In re Salander-O'Reilly Galleries, LLC*, 506 B.R. 600, 608-09 (S.D.N.Y. 2014).

[110]     *In re Morgansen's*, 302 B.R. at 787 n.4 (quoting *In re Valley Media, Inc.*, 279 B.R. 105, 121 (D. Del. 2002)).

**D.    Conversion**

Under New York law, "'[a] conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession.'"[111]  The Second Circuit recognizes "joint[] and several[] liab[ility] for conversion based on concerted action"[112] but requires that a plaintiff "demonstrate . . . by a preponderance of the evidence (1) an express or tacit agreement to participate in a common plan or design to commit a tortious act, (2) tortious conduct by each defendant, and (3) the commission by one of the defendants, in pursuance of the agreement, of an act that constitutes a tort."[113]  The "appropriate measure of [conversion] damages is the value of the property at the time and place that the conversion occurred."[114]

**E.    Aiding and Abetting Fraud and Breach of Fiduciary Duty**

---

[111]    *Okyere v. Palisades Collection, LLC*, 961 F. Supp. 2d 522, 534 (S.D.N.Y. 2013) (quoting *Colavito v. New York Organ Donor Network, Inc.*, 8 N.Y.3d 43, 50 (2006)).

[112]    *Wells Fargo Bank, N.A. v. National Gasoline, Inc.*, 577 Fed. App'x 58, 59 (2d Cir. 2014).

[113]    *Id.* at 60 (further quotation marks and citations omitted).

[114]    *PG 1044 Madison Assocs. v. Sirene One, LLC*, 369 F. Supp. 2d 512, 517 (S.D.N.Y. 2005).

To prevail on a claim for aiding and abetting fraud, a plaintiff must prove:  "(1) the existence of an underlying fraud; (2) knowledge of this fraud on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in achievement of the fraud."[115]  "Focusing on the third prong, a 'defendant provides substantial assistance only if [she] affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables [the fraud] to proceed.'"[116]  "Whether the assistance is substantial 'is measured, in turn, by whether the action of the aider and abettor *proximately caused* the harm on which liability is predicated.'"[117]  "[W]here a . . . firm moves beyond performing mere ministerial or routine clearing functions and becomes actively and directly involved in the [scheme], it may expose itself to liability with respect to the . . .

---

[115]   *Ritchie Capital Mgmt., L.L.C. v. General Elec. Capital Corp.*, No. 14 Civ. 8623, 2015 WL 4635630, at *14 (S.D.N.Y. Aug. 4, 2015) (quotation marks and citation omitted).

[116]   *Id.* (alterations in original) (quoting *JPMorgan Chase Bank v. Winnick*, 406 F. Supp. 2d 246, 256 (S.D.N.Y. 2005)) (further citation omitted).

[117]   *Id.* (emphasis in original) (quoting *In re WorldCom, Inc. Secs. Litig.*, 382 F. Supp. 2d 549, 560-61 (S.D.N.Y. 2005) (further quotation marks omitted). *Accord JPMorgan Chase*, 406 F. Supp. 2d at 256 ("Essentially, [t]he substantial assistance element has been construed as a causation concept, requiring that the . . . acts of the aider and abettor [have] proximately caused the harm upon which the primary liability is predicated.") (alteration in original) (quotation marks and citation omitted).

-27-

misdeeds."[118]

Relatedly, the elements of a New York state law claim for aiding and abetting a breach of fiduciary duty are: "'(1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach.'"[119]  With respect to the second requirement, "'[a] person knowingly participates in a breach of fiduciary duty only when he or she provides 'substantial assistance' to the primary violator.'"[120]  "A claim of aiding and abetting a breach of fiduciary duty is similar to a claim for aiding and abetting a fraud in that both causes of action require . . . actual knowledge, substantial assistance, and proximate causation."[121]

## F.    Unjust Enrichment

"The basic elements of an unjust enrichment claim in New York require proof that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what

---

[118]    *McDaniel v. Bear Stearns & Co.*, 196 F. Supp. 2d 343, 353 (S.D.N.Y. 2003).

[119]    *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 294 (2d Cir. 2006) (quoting *Kaufman v. Cohen*, 760 N.Y.S. 2d 157, 169 (1st Dep't 2003)) (further citations omitted).

[120]    *Id.* (alteration in original) (quoting *Kaufman*, 760 N.Y.S. 2d at 170).

[121]    *In re Agape Litig.*, 681 F. Supp. 2d 352, 366-67 (E.D.N.Y. 2010).

plaintiff is seeking to recover."[122]  "Given that unjust enrichment is a claim in

quasi-contract, it requires some relationship between plaintiff and defendant."[123]

"Although 'a plaintiff need not be in privity with the defendant to state a claim for

unjust enrichment, there must exist a relationship or connection between the parties

that is not too attenuated.'"[124]  "Moreover, the [New York] Court of Appeals has

suggested . . . that a defendant's awareness of the plaintiff and of the potential

negative impact of its own conduct on the plaintiff may serve as further indication

of the required closeness between [the] parties."[125]

### G.    Alter Ego Liability

Under Delaware law,[126] "the shareholders of a corporation and the

---

[122]    *Grynberg v. ENI*, 503 Fed. App'x 42, 44 (2d Cir. 2012) (quotation marks and citation omitted).

[123]    *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 737 (S.D.N.Y. 2013).  *Accord Grynberg*, 503 Fed. App'x at 44 (affirming grant of summary judgment where "[t]he district court determined that [plaintiff's] claim failed because he could not show any relationship, or even any communication, between himself and [defendant]").

[124]    *Cohen v. BMW Invs. L.P.*, No. 15 Civ. 3154, 2015 WL 6619958, at *7 (S.D.N.Y. Oct. 30, 2015) (quoting *Georgia Malone & Co., Inc. v. Rieder*, 19 N.Y.3d 511, 516 (2012)).

[125]    *Chen*, 8 F. Supp. 3d at 465 (citing *Georgia Malone*, 19 N.Y.3d at 517).

[126]    "It is well-settled that New York's choice-of-law rules dictate that the law of the state of incorporation determines when the corporate form will be disregarded."  *Jonas v. Estate of Leven*, No. 14 Civ. 3369, 2015 WL 4522763, at

members of an LLC generally are not liable for the debts of the entity."[127]

"However, Delaware law permits a court to pierce the corporate veil where there is fraud or where [the corporation] is in fact a mere instrumentality or alter ego of its owner."[128]  "Under the alter ego theory of piercing the corporate veil, a plaintiff must demonstrate a mingling of the operations of the entity and its owner plus an overall element of injustice or unfairness."[129]  With respect to the first requirement, "[c]ourts consider the following factors in determining whether . . . [the entities in question] operate as a 'single economic entity':

> [W]hether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder.[130]

With respect to the second requirement, the "injustice must consist of more than

---

*13 (S.D.N.Y. July 27, 2015) (collecting cases) (quotation marks and further citations omitted).

[127]   *De Sole v. Knoedler Gallery, LLC*, Nos. 12 Civ. 2313, 12 Civ. 5263, 2015 WL 5918458, at *37 (S.D.N.Y. Oct. 9, 2015) (quotation marks and citation omitted).

[128]   *Id.* (alterations in original) (quotations marks and citation omitted).

[129]   *Id.* (quotation marks and citation omitted).

[130]   *Id.* at *38 (quotation marks and citation omitted).

merely the tort or breach of contract that is the basis of the plaintiff's lawsuit."[131]

"Effectively, the corporation must be a sham and exist for no other purpose than as

a vehicle for fraud."[132]  As a fact-specific inquiry, "[t]he issue of 'corporate

disregard is generally submitted to the jury.'"[133]

## V.    DISCUSSION

### A.    Overton's Motion

#### 1.    Declaratory Judgment Regarding the Chagall, Dufy, Moore, and Wesselmann

Overton seeks a declaratory judgment that the Chagall, Dufy, Moore,

and Wesselmann are "owned solely by Overton."[134]  Defendants dispute Overton's

claim over these Works and assert that Cerulean acquired good title to them upon

purchasing them from Sammons.  The parties agree, however, that the ownership

issue turns on whether Cerulean's purchases are protected by the merchant

---

[131]    *NetJets Aviation, Inc. v. LHC Commc'ns., LLC*, 537 F.3d 168, 183 (2d Cir. 2008).

[132]    *Dumont v. Litton Loan Servicing*, No. 12 Civ. 2677, 2014 WL 815244, at *21 (S.D.N.Y. Mar. 3, 2014).

[133]    *Stahlex-Interhandel Trustee v. Western Union Fin. Servs. E. Europe Ltd.*, No. 99 Civ. 2246, 2002 WL 31359011, at *5 (quoting *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 59 (2d Cir. 1988)) (further citation omitted).

[134]    Pl. Mem. at 3.

entrustment rule and related UCC provisions.[135]  Put simply, if Cerulean's

purchases are protected by the merchant entrustment rule, Cerulean acquired good

title at the point of sale.  If Cerulean's purchases are not so protected, Overton's

ownership claim prevails.

> a.   **A Fact Dispute Exists as to Whether the Chagall and Moore Were Entrusted to TSI NY**

With respect to the Chagall and Moore only — which Overton

maintains were delivered to Sammons UK and/or TSFAA UK in London —

Overton argues that the merchant entrustment rule cannot protect Cerulean's

purchases because she did not entrust these Works to their seller, TSI NY.[136]  The

crux of Overton's argument is that Sammons converted these Works by sending

them to TSI NY.  As a result, Overton argues, defendants "could not take good title

to Works wrongfully transferred."[137]

While TSI NY (and subsequently, Cerulean) could not have acquired

good title to converted works,[138] a factual dispute remains as to whether the

---

[135]    *See* N.Y. U.C.C. § 2–403.

[136]    *See* Pl. Mem. at 6.

[137]    *Id.* at 6-7.

[138]    *See, e.g.*, *Bakalar*, 619 F.3d at 140.  *See also Kozar v. Christie's Inc.*, 71 N.Y.S.2d 555, 557 (2d Dep't 2013) (holding that UCC § 2–403(2) applies only to purchases from "the merchant to whom the property was entrusted") (quotation

Chagall and Moore were, in fact, converted as a result of their transfer to New York.  As to her initial burden, Overton fails to demonstrate the absence of a genuine issue of material fact.  Overton cites primarily to paragraphs 10 and 11 of her Rule 56.1 Statement,[139] both of which are disputed by defendants.[140]  At most, these paragraphs (and the documents referenced therein) indicate that the Chagall and Moore were physically delivered to and/or insured by Sammons' London affiliates, facts that are not necessarily inconsistent with any authority that Sammons — the individual — might have had to send these Works to his affiliated company, TSI NY.[141]  Further, although Overton contends that "the Chagall was [not consigned] . . . but merely released to [Sammons] for the purpose of storing and insuring [it] in London,"[142] the UCC provides that entrustment can "include[] any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery."[143]

---

marks and citation omitted).

[139]    *See* Pl. 56.1 ¶¶ 10-11.

[140]    *See* Defs. Responses to Pl. 56.1 ¶¶ 10-11.

[141]    *See* Pl. 56.1 ¶¶ 10-11; 11/22/13 Overton-TSFAA UK Agreement at 8-14.

[142]    Pl. Mem. at 6.

[143]    N.Y. U.C.C. 2–403(3).

Moreover, the record contains evidence — applicable to one or both Works — that could support the conclusion that the transfer of the Chagall and Moore to TSI NY was not a conversion. This evidence includes: Overton's consignment agreement, which covers "Timothy Sammons Inc. and any affiliated company"[144] and includes TSI NY's address on the consignment agreement's cover page and introduction,[145] other relevant documents between Sammons and Overton that listed TSI NY's address,[146] and Sammons' introductory email to Overton explaining that he serves his clients from both London and New York.[147] Viewing the evidence in the light most favorable to defendants, because a reasonable juror could conclude that Overton's entrustment encompassed TSI NY, summary judgment is not appropriate.

### b.   A Fact Dispute Exists as to Whether Cerulean Was a Buyer in the Ordinary Course

Regarding the Chagall, Dufy, Moore, and Wesselmann, Overton also argues that defendants cannot benefit from the merchant entrustment rule because they were not buyers in the ordinary course of business. Although this issue is an

---

[144]   11/22/13 Overton-TSFAA UK Agreement at 9.

[145]   *See id.* at 8-9.

[146]   *See, e.g.*, 12/2/14 TSFAA UK Receipt.

[147]   *See* 2/5/08 Sammons-Overton Letter at 4.

affirmative defense for which defendants bear the burden of proof at trial,[148] its

applicability presents a genuine factual dispute on summary judgment.

### i.      UCC Section 1–201(b)(9)

Overton first contends that defendants "cannot rely on [the merchant

entrustment rule] as a basis for obtaining the Works addressed in this Section"

because defendants acquired them "'in total or partial satisfaction of a money

debt.'"[149]  Although defendants acknowledge that Section 1–201(b)(9) of the UCC

excludes lenders from the definition of "buyers in the ordinary course," they argue

that they acquired these Works as outright purchasers, not lenders.

In advancing their respective positions, each side selectively cites

helpful portions of the record.  To characterize defendants as lenders, Overton

argues that defendants (1) did not pay sales tax on the relevant transactions; (2) in

purchasing six works for $510,000, paid approximately forty percent of the

$1,250,000 value "ascribed by Sammons" in pre-purchase emails to defendants,

which falls within Rose's described loan-to-value ratio; (3) identified the Moore as

"collateral" in an email to a sub-lender; and (4) acquired the Chagall in satisfaction

---

[148]     *See Chen*, 8 F. Supp. 3d at 453.

[149]     Pl. Mem. at 7 (quoting N.Y. U.C.C. § 1–201(b)(9)).

of a loan that had been extended to Sammons.[150]

Defendants offer competing evidence and arguments against Overton's characterization. *First*, as to their non-payment of sales tax, defendants explain that the Works were to be delivered in Delaware, a tax-free state — an explanation that is supported by record evidence including that the purported buyer, Cerulean, is incorporated in Delaware and that its principal, Rose, maintains a residence in the state.[151]

*Second*, defendants contend that Overton's argument that the purchase price comports with Rose's typical loan-to-value ratio is a red herring because it is based on Sammons' "wish" price for each piece, not actual appraisal values.[152] Notably, Overton's evidence of valuation (and to some extent, defendants') is drawn from dealers' figures in communications with other market participants — evidence that a reasonable juror could reject because it may be based on the motivation for personal profit (rather than on expert assessments of the market).[153]

*Third*, defendants assert that the email reference to "collateral" was

---

[150]    *Id.* at 8-9 (citing, *inter alia*, Pl. 56.1 ¶¶ 18, 31, 35-37, 96).  *See also* Pl. 56.1 ¶ 20.

[151]    *See* Opp. Mem. at 22; Pl. 56.1 ¶ 187.

[152]    Opp. Mem. at 8.

[153]    *See, e.g.*, Pl. 56.1 ¶¶ 104-106.

"quick and easy nomenclature for Mr. Rose to use in the context of speaking with a lender about [a] potential loan against a different piece,"[154] particularly given that Rose had previously informed that lender that he was "doing a sale/buyback for a Henry Moore" under which Rose "would actually take title to the work - with the seller getting a buyback option."[155]

      *Fourth*, defendants explain that while the Chagall initially served as collateral for the December 2014 loan from Knickerbocker, Sammons sold the piece to Cerulean in February 2015 for $600,000 (as memorialized by that bill of sale).[156]

      The record also contains other evidence which could support the conclusion that defendants did not acquire these four Works in a lending capacity, including that these acquisitions were memorialized by bills of sale — which are

---

[154]    Opp. Mem. at 6.

[155]    *Id.* (quoting 2/8/14 Email from Andrew Rose to Jason Riley, Ex. C to Greeley Decl., at 2722). Overton also argues that the Court should disregard Rose's explanation of his reference to Moore as "collateral" because it is drawn from "'a self-serving, contradictory affidavit' that "conflicts with documentary evidence.'"  Plaintiff's Reply Memorandum of Law in Support of Motion for Partial Summary Judgment at 4 (quoting *BanxCorp v. Costco Wholesale Corp.*, 978 F. Supp. 2d 280, 299 (S.D.N.Y. 2013)) (further quotation marks and citation omitted).  As discussed, however, Rose's explanation neither directly contradicts documentary evidence nor is the sole evidence supporting Rose's position. Accordingly, I find that such evidence raises a triable issue of fact.

[156]    *See* Defs. Response to Pl. 56.1 ¶ 94 (citing 2/20/15 Bill of Sale).

markedly different from the loan agreements that are also in the record.[157]  With

such conflicting factual characterizations, the issue of whether defendants acquired

these Works as lenders or purchasers cannot be resolved by summary judgment.

### ii.     Red Flags

Alternatively, Overton argues that defendants were not buyers in the

ordinary course because, as art merchants, they disregarded warning signs about

the defects in Sammons' sales and thus, failed to meet their heightened duty of

good faith.[158]  As a threshold matter, Overton argues that defendants qualify as

merchants in art under Section 2–104(1) of the UCC.[159]  Moreover, she argues that,

as in *Davis v. Carroll*, defendants in this case purchased the Works despite

significant red flags about Sammons' lack of authority to sell them.[160]  According

to Overton, these red flags included the receipt of "bargain basement" prices for

the Works, transactions through unusual "Sale and Repurchase Agreements" that

---

[157]     *Compare, e.g.*, 2/5/14 Bill of Sale *with* 7/1/14 Loan and Security
Agreement.

[158]     *See* N.Y. U.C.C. § 2–103(1)(b); *Davis*, 937 F. Supp. 2d at 426-27.

[159]     *See* Pl. Mem. at 9-10 (stating that "Cerulean is clearly a merchant in
art, since it has no business other than the purchase or sale of art," "Rose clearly
holds himself out as an art merchant, as does AFP, which acts as an agent for the
buying and selling of art," and "Rose and Cerulean are legally one and the same").

[160]     937 F. Supp. 2d at 426 (citation omitted).

were "virtually identical" to the agreements rejected in *Davis*, and awareness that during these transactions, Sammons was acting as an agent, experiencing financial difficulties, and under investigation for fraud.[161]

Defendants respond that they neither qualify as merchants under the UCC nor encountered warning signs that would have required further investigation into the validity of Sammons' sales. Even assuming that defendants do qualify as merchants — thus triggering a heightened duty of good faith — summary judgment is inappropriate because, properly viewing the evidence in favor of the non-moving party, a reasonable juror could conclude that defendants nevertheless met that duty.

*First*, the purchase prices cannot be considered red flags at this stage because the record does not contain sufficient evidence of the Works' true market value. While this factor can serve as a "critically important red flag,"[162] unlike in *Davis*, neither party has yet provided expert testimony regarding market valuation (or any other issue).[163] Rather, as noted, both parties cite dealers' estimates as

---

[161]    Pl. Mem. at 14. *Accord id.* at 14-18.

[162]    *Davis*, 937 F. Supp. 2d at 432.

[163]    *See id.* at 402-407. However, the parties' Joint Pre-Trial Statement indicates that they plan to present expert testimony on this issue at trial. *See* Joint Pre-Trial Order at 19-20 (Dkt. No. 106). Further, I note that although defendants offer past appraisals of the Works (including appraisals by Christie's and

valuation evidence — figures that a juror might reasonably find to be unreliable. Further, it is impossible to determine individual purchase prices for three of the four Works (the Dufy, Moore, and Wesselmann) because defendants purchased them for a lump sum.

   *Second*, there is a genuine factual dispute as to whether such agreements "were unusual with respect to ordinary dealings in the art business and [defendants'] prior dealings with [Sammons]."[164]  Again, this is an issue on which the *Davis* parties presented expert testimony but the parties here have not.[165] Although Overton argues that defendants' agreements were identical to those rejected in *Davis*, the *Davis* agreements were structured differently and involved substantially more Works and transactions than those at issue here.[166]  Defendants also assert that their agreements were not irregular because they have previously entered into similarly-structured transactions with other counterparties.[167] Therefore, whether defendants' agreements with Sammons were red flags raises a

---

Sotheby's), such evidence may be inadmissible hearsay (although I do not make any ruling on their admissibility at this time).  *See* Opp. Mem. at 9-10.

[164] *Davis*, 937 F. Supp. 2d at 407.

[165] *See id.*

[166] *See id.* at 394.

[167] *See* Cerulean Declaration ¶ 36.

disputed issue of fact.

       *Third*, a reasonable juror could find that defendants did not know that Sammons was acting as Overton's agent in connection with the Works. Although Overton again attempts, *inter alia*, to analogize to *Davis*, that case is distinguishable because defendants in *Davis* had not obtained any representations from the seller regarding his authority to sell.[168]  At the very least, defendants' purchases here were memorialized by bills of sale in which Sammons attested to his authority to transfer clear title.[169]  Additionally, defendants assert that they believed Sammons transacted, at least in part, for his own accounts and cite to an unrelated lawsuit in which Sammons appears to have done so.[170]

       *Fourth*, it is not beyond dispute that defendants knew about Sammons' financial difficulties.  Overton cites to emails in which Sammons expresses time-sensitive needs for liquidity, but defendants aver that they perceived those communications as being "consistent with dealers who often buy

---

[168]    *See* 937 F. Supp. 2d at 429 ("[N]one of the documentation associated with the transfer of these works listed [the seller] as the owner and [the sellert] never told [defendant] that he . . . did, in fact, own the works. [Defendant] has not pointed to any document that listed [the seller] as the owner. To the contrary, the documents all listed "Estate of the Artist" as the provenance.").

[169]    *See, e.g.*, 2/20/15 Bill of Sale ("The seller hereby confirms that . . . all rights, title and interest to the work are hereby transferred free and clear. . . .").

[170]    *See* 8/3/07 Hambleden-TSI NY Option Agreement.

work for their account, only to turn and sell it to another party at a profit[,] . . . [a] type of activity [that] requires cash which a dealer may not have until the second part of the transaction is consummated."[171]   Thus, crediting defendants' characterization as required on this motion, the question of defendants' subjective knowledge as to Sammons' solvency must be decided by the jury.[172]

*Fifth*, defendants deny that they were aware of the accusations of misconduct against Sammons prior to the relevant purchases.  In support of her argument, Overton cites two civil cases against Sammons (filed in New York State court in January and November 2014, respectively) and one criminal investigation into his dealings (in connection with which defendants received a grand jury subpoena in January 2015).[173]   Neither example conclusively establishes the existence of red flags.  Defendants maintain that they were completely unaware of the civil cases.  Further, the criminal investigation has no bearing on the Dufy,

---

[171]     Opp. Mem. at 12.

[172]     On January 29, 2016 — over one month after summary judgment briefing was complete — Overton submitted a letter summarizing "evidence that has recently come to light about Defendants' interactions with Sammons  . . . in 2013 and early 2014 (prior to any of [Overton's] Works being provided to Defendants)."  2/29/16 Letter from Overton to the Court at 2 (Dkt. No. 107). Defendants have not been had the opportunity to respond to this information, and I do not consider it in issuing this Opinion.

[173]     *See* Pl. Mem. at 17-18.

Moore, or Wesselmann because all were purchased months before the January 2015 subpoena.  Moreover, defendants contend that the subpoena did not alert them to potential defects in the Chagall sale because they believed the subpoena was related to an ongoing, highly-publicized investigation into sales tax practices across the industry.[174]  Accordingly, based on the record before me (which must be construed in defendants' favor), I cannot issue a declaratory judgment regarding the Chagall, Dufy, Moore or Wesselmann without a full trial.[175]

### b.    Declaratory Judgment Regarding the Modigliani

Overton also seeks a declaratory judgment that she owns the Modigliani free and clear of any liens or encumbrances by defendants.  Unlike the Works just discussed, defendants do not claim to have purchased the Modigliani. Rather, they maintain that, due to the loan agreement between Knickerbocker and Sammons, Section 9–319(a) of the UCC gives Knickerbocker a security interest that is superior to Overton's claim to the Work.

The determination of whether Knickerbocker has priority depends on whether Overton's transfer of the Modigliani to Sammons constituted a consignment under Section 9–102(a)(20).  In order for the transfer to qualify as a

---

[174]    *See* 1/22/15 ArtNet News Article.

[175]    937 F. Supp. 2d at 432.

consignment, the UCC requires, *inter alia*, that Sammons not have been "generally known by its creditors to be substantially engaged in selling the goods of others."[176]

Accordingly, Overton argues that the transfer was not a Section 9–102(a)(20) consignment because Sammons' creditors, including defendants, knew that Sammons' business was "one of agency"[177] — *i.e.*, largely premised on "selling the goods of others."[178]  In support of this, Overton points to several undisputed facts in the record, including that New York art dealer David Tunick testified that he "knew Sammons to be somebody who acted on behalf of owners, the little [he] knew of him."[179]  Likewise, Sammons' website stated, *inter alia*, that Sammons and his companies "act at all times professionally, exclusively, and unambiguously on behalf of our principal" and that

> TSFAA was founded to address a growing demand among sellers of art for truly impartial advice and representations in their dealings with auction houses, private treaty sales, and tax authorities.  Having worked primarily with the owners and sellers of art, the company has expanded to provide similarly impartial

---

[176]   N.Y. U.C.C. Section 9–102(a)(2)(iii).

[177]   Pl. Mem. at 20.

[178]   N.Y. U.C.C. § 9–102(a)(20).

[179]   9/30/15 Deposition of David Tunick, Ex. Q to 12/4/15 Declaration of John Cahill, at 137:7-14.

advice to buyers.[180]

Such undisputed facts suggest that Sammons was known within the art world —

even to those who did not know him well — as someone who transacted as a fine

art agent.  Thus, it stands to reason that fine art creditors would be aware of the

nature of Sammons' business.

Defendants do not offer any evidence that would place this conclusion

in dispute.  Rather, they deny "that they believed Sammons acted only as an agent

or was substantially engaged in selling the goods of others," cite "a case where

Sammons bought for his own account,"[181] and emphasize that Rose never read the

explanation on Sammons' website regarding the agency aspects of his business.[182]

At most, these facts suggest only that defendants *themselves* did not appreciate

Sammons' reputation.  Even if one could believe that art financiers like defendants

were unaware that Sammons dealt largely in consigned goods — a fact that seems

particularly implausible given that Rose met Sammons two decades ago while

working in auction houses (which, by definition, are in the business of

---

[180]    Printouts from TSFAA UK Website, Ex. J to Cahill Decl., at 8-10.

[181]    Opp. Mem. at 19 (citing 12/4/15 Declaration of Andrew Rose ("12/4/15 Rose Decl.") ¶ 7; 8/13/07 Option Agreement Between William Henry Fourth Viscount Hambleden and TSI NY ("8/3/07 Hambleden-TSI NY Option Agreement"), Ex. G to Greeley Decl., at 2-14).

[182]    *See* Defs. Response to Pl. 56.1 ¶ 34.

consignment) — the relevant inquiry is what was "*generally known*" by Sammons' creditors as a group.[183]  Accordingly, because defendants' security interest fails under Sections 9–102(a)(20) and 9–319(a), Overton is entitled to a declaratory judgment that she owns the Modigliani without any liens or encumbrances by defendants.[184, 185]

### 2.   Claims for Damages

#### a.   Conversion

Overton also seeks summary judgment on her conversion claim as it relates to the Chagall, Dufy, Modigliani, Moore, and Wesselmann.[186]  To sustain a

---

[183]   N.Y. U.C.C. § 9–102(a)(20) (emphasis added).  Defendants also suggest that "Knickerbocker has priority" because "Knickerbocker filed a UCC Financing Statement on the Modigliani and Plaintiff (wanting confidentiality) did not."  Opp. Mem. at 18.  This argument is a red herring.  Any failure by Overton to perfect her interest is irrelevant because UCC Section 9–319(a) governs the rights of creditors when the owner's interest was not perfected.

[184]    Having held that defendants' asserted interest in the Modigliani is invalid under the UCC, I do not address Overton's alternative arguments regarding her ownership of this Work.

[185]   Defendants also suggest that their interest is protected by UCC Section 2–326.  This view appears to be based on an outdated version of that code section, which no longer applies to consignments.  *See* N.Y. U.C.C. § 2–326 cmt. 4 ("Certain true consignment transactions were dealt with in former Sections 2–326(3) and 9–114. These provisions have been deleted and have been replaced by new provisions in Article 9. *See, e.g.*, Sections 9-109(a)(4); 9-103(b); 9-319.").

[186]   It is unclear whether Overton also seeks summary judgment on her conversion claim as it relates to the Picasso.  *See* Pl. Mem. at 3 (requesting "compensatory and punitive damages for Rose's conversion of the Works" —

claim for conversion, defendants must have "intentionally and without authority, assume[d] or exercise[d] control over [Overton's] personal property . . . , interfering with [Overton's] right of possession."[187]  However, having held that genuine factual disputes exist as to Overton's continued ownership of the Chagall, Dufy, Moore, and Wesselmann, summary judgment as to the conversion of these Works is denied.  But because Overton owns the Modigliani free and clear of any claim by defendants, they are liable for conversion for the reasons set forth above.[188]

### b.    Aiding and Abetting Breach of Fiduciary Duty and Fraud

Overton also includes a cursory request to hold defendants' liable for

---

defined earlier as "the Chagall, Dufy, Modigliani, Moore, and Wesselmann Works" — "and her loss of the Picasso due to Rose aiding and abetting torts by Sammons").  Because Overton's motion appears to distinguish the Picasso from the other Works at issue, I have construed it as excluding the Picasso from the request for conversion damages.  As discussed *infra* at Section V(B), however, defendants seek summary judgment on all claims relating to the Picasso, including the conversion claim, but genuine factual disputes exist on all of these claims.

[187]    *Okyere*, 961 F. Supp. 2d at 534 (quotation marks and citation omitted).

[188]    This is a ruling on liability only.  Although Overton requests "compensatory and punitive damages," I make no judgment regarding the amount of compensatory and/or punitive damages to be awarded.  Pl. Mem. at 3.  I also note that the parties have not provided briefing on the extent, if any, to which defendants' asserted security interest in the Modigliani interfered with Overton's right of possession.

-47-

aiding and abetting Sammons' torts against her.  The parties do not appear to dispute the existence of the underlying torts — *i.e.*, that Sammons committed a fraud against, and breached his fiduciary duty to, Overton.  The only relevant issue is whether defendants' actions constituted unlawful aiding and abetting of these actions.  To do so, defendants must have (1) known of Sammons' breaches *and* (2) provided substantial assistance to his misconduct.[189]

As to the first prong, defendants' knowledge of Sammons' breaches may be the most fundamental disagreement in this case.  As discussed earlier in Section V(A)(1)(b)(ii), Overton argues that defendants were aware that Sammons lacked authority to sell the Works, whereas defendants contend that they had no reason — *i.e.*, "red flags" — to suspect that Sammons was peddling works to which he lacked good title.

Further, with respect to the second prong, Overton cites only to the fact that defendants required "a warehouse to stay open late so that a dealer could — and did — purchase Overton's Picasso at an unreasonably low price [which was] just enough to pay off the loan [Sammons owed] to Defendants so that they would release the Picasso to the buyer."[190]  Defendants dispute this

---

[189]     *See Ritchie*, 2015 WL 4635630, at *14;  *Lerner*, 459 F.3d at 294.

[190]     Pl. Mem. at 22 (citing Pl. 56.1 ¶¶ 171, 178, 181-184).

characterization, explaining that they simply provided ministerial assistance in allowing the Skarstedt representative to view the Picasso, for which Sammons provided compensation.  Accordingly, the question of whether defendants' action rose to the level of substantial assistance must also be determined by the fact-finder.

### 3.    Alter Ego Liability

Overton also urges that Rose and the corporate defendants be held liable, as alter egos, for one another's conduct.  Piercing the corporate veil is a fact-intensive inquiry, requiring both that the corporate defendants operated as a single economic entity and that there be an overall element of injustice.[191]  Here, summary judgment is precluded because there are genuine factual disputes as to both of these requirements.

With respect to the single economic entity requirement, Overton cites, *inter alia*, to the facts that Rose is the sole member of the corporate defendants, and that the corporate defendants shared office space and servers, transacted with and on behalf of one another, and maintained inter-company accounts.  Defendants respond, however, that such evidence is consistent with the fact that each corporate defendant is a small limited liability corporation with limited resources.  Further,

---

[191]    *See De Sole*, 2015 WL 5918458, at *37-38.

defendants assert that each defendant had separate, adequately capitalized bank accounts and that the existence of inter-company lines of credit supports the conclusion that they operated as independent entities.[192]

Even assuming that defendants do function as a single economic entity, Overton offers very little to prove overall injustice.  For the most part, she conflates this second requirement with the first.  She also improperly suggests that the misconduct alleged in this case may, without more, serve as the requisite evidence of unfairness.[193]  On the other side, defendants offer evidence that could lead a reasonable juror to determine that the corporate defendants were not created primarily as vehicles for fraud.  For example, defendants assert that each corporate defendant "was using its separate existence . . . long before Sammons came along and each has continued using their legitimately separate forms long after Sammons."[194]  Additionally, Rose's assertion that Cerulean owns over one hundred works of art and one thousand items in total further supports their argument that the corporate defendants have legitimate purposes.  Thus, viewing the evidence in

---

[192]    *See* Opp. Mem. at 24 (citing 12/4/15 Rose Decl. ¶¶ 32, 34, 35).

[193]    *See NetJets Aviation*, 537 F.3d at 183 ("[The] injustice must consist of more than merely the tort or breach of contract that is the basis of the plaintiff's lawsuit.").

[194]    Opp. Mem. at 25 (citing 12/4/15 Rose Decl. ¶¶ 30-34).

the light most favorable to defendants, summary judgment on the issue of alter ego liability is also denied.

### B.    Defendants' Motion

.          #### 1.    Claims Relating Only to the Picasso

Overton brings four Picasso-related claims against defendants, seeking damages for conversion (Second Claim), aiding and abetting breach of fiduciary duty (Third Claim), aiding and abetting fraud (Fourth Claim), and unjust enrichment (Eighth Claim).[195]  It is undisputed that the Picasso was sold by Sammons to non-party Skarstedt, which in turn sold the Work to a third party.  It is also undisputed that defendants loaned money to Sammons using the Picasso as collateral and took physical possession of the Work for approximately three months while that loan was outstanding.

Defendants seek summary judgment in their favor on all Picasso-related claims, arguing that "Plaintiff seeks damages based upon her purported inability to recover the Picasso from [a] third-party" and that "there is no direct causal connection between the Defendants' alleged conduct and this loss."[196]

---

[195]    I address defendants' request for summary judgment on the Eighth Claim *infra* at Section V(B)(2), as this aspect of defendants' motion relates to all of the Works, including the Picasso.

[196]    Defendants' Joint Memorandum of Law in Support of Motion for Partial Summary Judgment ("Defs. Mem.") at 5.

Overton responds, however, that "Defendants' actions were not those of a provider of merely ministerial services to the wrongdoer" but that defendants "(as the sales agent) arranged the 'sale' of the Picasso to Skarstedt, directly transferred the Picasso to Skarstedt, and profited handsomely from doing so."[197]

### a.   Conversion

Defendants argue that they cannot be liable for conversion because Overton has not alleged, let alone proven, that the Picasso was harmed during the few months that it was held by AFP.  Overton responds that defendants have distorted her requested relief, as she is not seeking recovery for the period during which the Picasso was in AFP's custody.  Rather, Overton explains, she aims to hold defendants jointly and severally liable for the damages resulting from "the wrongful taking, detention, and subsequent transfer of the Picasso (from Skarstedt) to a good faith purchaser."[198]

Overton correctly asserts that joint and several liability is available, as a matter of law, for intentional torts such as conversion.[199]  Defendants maintain,

---

[197]   Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Partial Summary Judgment ("Pl. Opp.") at 2.

[198]   *Id.* at 14.

[199]   *See Wells Fargo*, 577 Fed. App'x at 59-60 (explaining that joint and several liability may apply where plaintiff demonstrates, *inter alia*, that defendants engaged in an "an express or tacit agreement to participate in a common plan or

however, that they had no involvement in either the sale from Sammons to

Skarstedt or from Skarstedt to the third party.  In support of this, defendants cite

several statements from Rose's declarations, as well as the facts that defendants

were not party to certain communications between Sammons and Skarstedt and did

not collect a commission from Sammons' sale to Skarstedt.[200]  Overton, in turn,

presents countervailing facts such that a reasonable juror could find that defendants

did agree to participate in the conversion.  For example, Overton notes that "97%

of the purchase price ($1,550,000) [on the sale from Sammons to Skarstedt] . . .

was wired directly to . . . Defendants' account[, which was] . . . just enough to pay

off the 'loan' [Sammons] received from . . . Defendants."[201]  Additionally, Overton

notes that Rose arranged an after hours viewing of the Picasso for Skarstedt before

the purchase.[202]  Accordingly, because defendants may be found jointly and

severally liable for conversion of the Picasso and there is a genuine factual dispute

as to defendants' role in this sale, defendants' request for summary judgment is

_____

design to commit a tortious act").

[200]    *See* Def. Mem. at 7-8 (citing 11/16/15 Rose Decl. ¶¶ 5-7, 13);
Defendants' Joint Memorandum of Law in Further Support of Motion for
Summary Judgment ("Defs.' Reply") at 9 (citing 12/16/15 Rose Decl. ¶¶ 22, 24, 26;
1/15/15 Email from "bona@skarstedt.com" to "timothy@timothy-
sammons.co.uk").

[201]    Pl. Opp. at 12.  *Accord* Pl. Supp. 56.1 ¶ 55.

[202]    *See* Pl. Opp. at 10.  *Accord* Pl. Supp. 56.1 ¶ 54.

denied.

### b.   Aiding and Abetting Breach of Fiduciary Duty and Fraud

Defendants' sole argument against the aiding and abetting claims is that they cannot be liable because they "did not proximately cause the damages Plaintiff allegedly suffered due to the Skarstedt sale[] of the Picasso."[203]  As discussed, however, there are genuine factual disputes as to defendants' role in, and liability for, Sammons' torts — some of which go to the issue of proximate causation, *i.e.*, whether defendants rendered substantial assistance to the primary tortfeaser, Sammons.[204]  For example, a reasonable juror could determine — based on facts such as defendants' storage of the Picasso and facilitation of Skarstedt's viewing and receipt of the Work — that defendants were a proximate cause of Sammons' ability to carry out his scheme.[205]  Further, the financing arrangement by which defendants received the majority of Sammons' sale proceeds could cause a fact-finder to conclude that defendants and Sammons together orchestrated (and benefitted from) the sale.  For these reasons, defendants' request for summary

-------

[203]    Defs. Reply at 2.  I do not address the "actual knowledge" prong of the aiding and abetting standard as defendants do not contest it in their motion.

[204]    *See JPMorgan Chase*, 406 F. Supp. 2d at 256.

[205]    *See McDaniel*, 196 F. Supp. 2d at 353.

judgment on the aiding and abetting claims is denied.

### 2.    Unjust Enrichment Claim

Defendants also argue that they cannot be liable for unjust enrichment with respect to any of the six Works because they have no direct substantive relationship with Overton. I note that a claim for unjust enrichment does not require contractual privity or other direct dealings between the parties. Rather, there simply must be "a relationship or connection between the parties *that is not too attenuated*."[206] In view of the factual disputes already identified — many of which may be probative of defendants' awareness of how their conduct would affect Overton — defendants are not entitled to a ruling that, as a matter of law, they are insufficiently connected to Overton to be liable for unjust enrichment.

Alternatively, with respect to the Picasso only, defendants argue that this claim must be dismissed because no reasonable juror could find that they were unjustly enriched at Overton's expense. In so arguing, defendants maintain that their sole financial benefit from the Picasso sale was the repayment of their loan to Sammons — *i.e.*, money that they were owed. Overton, however, proffers facts

---

[206]    *Cohen*, 2015 WL 6619958, at *7 (emphasis added) (quotation marks and citation omitted). *Accord Chen*, 8 F. Supp. 3d at 465 ("[T]he [New York] Court of Appeals has suggested . . . that a defendant's awareness of the plaintiff and of the potential negative impact of its own conduct on the plaintiff may serve as further indication of the required closeness between [the] parties." (citation omitted)).

that contradict defendants' characterization, including that "of the $2,000,000 that Sammons was . . . purportedly 'loaned,' only $789,000 was wired directly to Sammons" (with the remainder retained by defendants for, *inter alia*, "prepaid interest," "fees," and "expenses").[207]  Thus, Overton contends, defendants unjustly profited from the Picasso sale because the $1,550,000 that they received exceeded Sammons' outstanding loan balance.[208]  Given these genuine factual disputes, defendants' request for summary judgment on unjust enrichment is denied as to all of the Works, including the Picasso.

## VI.   CONCLUSION

For the foregoing reasons, Overton's motion is GRANTED in part and DENIED in part, and defendants' motion is DENIED in full.  The Clerk of the Court is directed to close these motions (Dkt. Nos. 64 and 69).  A conference is scheduled for February 10, 2016 at 3:30 PM, and trial will commence on March 1, 2016.

---

[207]    Pl. Opp. at 16-17 (citing Pl. Supp. 56.1 ¶¶ 100-101; 12/8/14 Net Loan Proceeds Schedule at 6).

[208]    *See* Pl. Supp. 56.1 ¶ 55.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
          February 2, 2016

**- Appearances -**

**For Plaintiff**:

John R. Cahill, Esq.
Paul Cossu, Esq.
Cahill Partners LLP
70 West 40th Street
New York, NY 10018
(212) 719-4400

**For Defendants**:

Mathew E. Hoffman, Esq.
Barton LLP
420 Lexington Avenue
New York, NY 10170
(212) 687-6262

Christopher P. Greeley, Esq.
Herrick, Feinstein LLP
2 Park Avenue
New York, NY 10016
(212) 592-1426